Jane DOE, et al., Plaintiffs,

v.

**ISLAMIC SALVATION FRONT,
et al., Defendants.**

No. CIV.A. 96–2792(JR).

United States District Court,
District of Columbia.

March 31, 2003.

---

Michael Maggio, Tahirih Justice Center, c/o Maggio & Kattar, Washington, DC, Rhonda Copelon, Catherine Albisa, Andrew J. Fields, International Women's Human Rights Clinic, Cuny Law School, Flushing, NY, Jennifer Green, Beth Stephens, William Goodman, Center for Constitutional Rights, Francis Matthews, Schulte Roth & Zabel LLP, New York City, for Plaintiffs.

Nicholas Gilman, Gilman & Associates, Washington, DC, for Defendant Haddam.

Rudolph Contreras, Assistant U.S. Attorney, Washington, DC, for Immigration & Naturalization Service, Executive Office for Immigration Review (Non Parties).

## MEMORANDUM

ROBERTSON, District Judge.

Plaintiffs are a number of Algerian citizens and a non-governmental organization of Algerian women called the Rassemblement Algerien de Femmes Democrates (FASD).[1] They bring this action under the Alien Tort Claims Act (ATCA), 28 U.S.C. § 1350,[2] against an Algerian political group known as the Islamic Salvation Front (FIS)[3] and one Anwar Haddam, who is or was a member of the FIS. The plaintiffs allege that Haddam assisted and encouraged armed Islamic groups in committing crimes against humanity, war crimes, and other violations of international law and domestic law. Haddam denies any involvement in facilitating or encouraging the alleged acts and moves for summary judgment. His motion will be granted, for the reasons set forth below.

### Background

In 1992, the military-backed government of Algeria aborted the first parliamentary elections ever held in that country when it appeared that the FIS, a fundamentalist Islamic group opposed to the military and secular regime, was about to win a majority of the seats. The FIS was dissolved and banned, and several of its leaders were arrested or killed. A bloody and brutal conflict between armed Islamic groups and the military ensued, with many atrocities committed against civilians.

The plaintiffs lay blame for that violence upon the FIS and other Islamic groups, alleging that the FIS espoused an extremist interpretation of Islamic law and encouraged and facilitated armed Islamic groups to kill, injure, and threaten civilians, including political activists and journalists who were critical of Islamic fundamentalism. In this case, they also lay blame upon—and seek to affix liability to—Anwar Haddam, an Algerian citizen and FIS member who was elected to the parliament before the final round of elections was canceled. They allege that Haddam facilitated the FIS in its violent activities and then publicly condoned the violence as the FIS's spokesperson in the United States, by issuing newsletters, communiques, declarations, and other statements from an office that he set up in Washington, D.C.[4] Haddam denies the plaintiffs' allegations.

Plaintiffs brought this action in 1996. Several years of litigation were consumed by discovery disputes related to confidentiality issues. Haddam asserted that he could not adequately prepare his defense unless he could obtain basic information

1. On February 3, 2003, students of the City of New York University Law School's International Women's Human Rights Clinic Program presented argument in support of the plaintiffs. The Court commends the students on the excellence of their oral advocacy, which assisted the Court's deliberations and judgment in this case.

2. Plaintiffs also sue under the Torture Victim Protection Act, 28 U.S.C. § 1350, note, but, for the reasons stated *infra* note 11, that statute is inapplicable.

3. The FIS has never been served and indeed may not exist. It was banned by the Algerian government in February 1992.

4. Haddam fled Algeria on March 3, 1992, after the Algerian military regime banned the FIS. He sought political asylum in the United States on April 7, 1993. Plaintiffs opposed his efforts to gain asylum, presenting materials to the Board of Immigration Appeals (BIA) concerning his alleged role in targeting civilians in Algeria. Haddam was initially refused asylum; the BIA reversed that decision; and then the BIA stayed its reversal decision temporarily until December 7, 2000. Def.'s Mot. for Summ. J., Ex. 1, *In re Anwar Haddam*, 2000 WL 1901995 (BIA 2000) (unpublished).

about the allegations against him, such as the identities of the anonymous plaintiffs. Both sides resisted making certain disclosures, asserting safety concerns. The individual anonymous "Jane Doe" or "John Doe" plaintiffs, some of whom currently reside in Algeria, said that they feared reprisal from Islamic groups for bringing this action. Haddam said that he feared for himself and his family because of his status as a defendant in this case. Discovery disputes were twice referred to a magistrate judge, who issued a final report and recommendation on May 25, 2000. Based on that report and recommendation, I quashed a subpoena duces tecum plaintiffs had served upon the INS seeking information related to Haddam's asylum application, and I granted Haddam's motion to compel answers to interrogatories, amending the confidentiality order to require plaintiffs to reveal their identities and to provide specific information about the alleged incidents. Plaintiffs' interlocutory appeal of those rulings was dismissed.

Some of the plaintiffs then voluntarily dismissed their claims (without prejudice). The remaining plaintiffs are:

1. **Jane and John Doe I**: their son was killed in June 1994 for his opposition to Islamic fundamentalism. Algerian police suspect that the Armed Islamic Group (GIA) was responsible. These plaintiffs fled the country after their home was ransacked.

2. **Jane Doe II**: witnessed from the airport and watched on television the hijacking of an airplane by the GIA on December 24, 1994. Her daughter and sister were passengers on the plane.

3. **Jane Doe IX**: her husband, a journalist who worked for a secular newspaper critical of the Islamic insurgency, was killed in 1995. The Islamic Salvation Army (AIS) alleg-

edly placed her husband on its hit list and advocated his death months before his murder.

4. **Omar Belhouchet**: he has allegedly received threats from the FIS. Plaintiff is an editor of El Watan, a newspaper that opposes the Islamist insurgency. He alleges that Haddam incited a violent campaign against journalists.

5. **Zazi Sadou (Jane Doe III)**: spokesperson for RAFD and leading Algerian feminist activist. She alleges that she has been targeted by armed Islamic groups. She blames Haddam for encouraging violence against "non-innocents" who opposed the FIS.

6. **RAFD**: suing on behalf of members who have been targeted by armed Islamic groups.

### Analysis

### I. Statute of limitations

Haddam first seeks to interpose D.C.'s one-year statute of limitations for intentional torts as a bar to all of plaintiffs' ATCA claims, citing *Tel–Oren v. Libyan Arab Republic*, 517 F.Supp. 542, 550–51 (D.D.C.1981), *aff'd on other grounds*, 726 F.2d 774 (D.C.Cir.1984). The ATCA lacks a specific statute of limitations. In such a situation, courts apply the statute of limitations of a closely analogous federal statute, if federal law "provides a closer analogy than available state statutes, and when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." *Reed v. United Transp. Union*, 488 U.S. 319, 324, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989). When *Tel–Oren* was decided, there was no federal statute that was closely analogous to the ATCA. After the enactment in 1991 of the

Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350, note, however, the federal courts found the TVPA to be closely analogous to the ATCA and borrowed its ten-year statute of limitations for the ATCA. *E.g., Papa v. United States,* 281 F.3d 1004, 1012 (9th Cir.2002); *Wiwa v. Royal Dutch Petroleum Co.,* No. 96 Civ. 8386, 2002 WL 319887, at *19 (S.D.N.Y. Feb. 28, 2002) (cataloguing three other district court cases). Plaintiffs brought their ATCA claims well within that ten-year period. Their claims are not time-barred.

## II. Issue preclusion

■ Haddam next argues that plaintiffs' claims are precluded by the BIA's decision reversing the denial of his asylum application, because the BIA found that he did not in fact participate in plans to target or persecute civilians. *In re Anwar Haddam,* Interim Decision, 2000 WL 1901995 (BIA 2000) (unpublished). Haddam's contention is that, by providing information to the BIA accusing him of complicity in the violence directed at civilians, plaintiffs "litigated" the issues in this case before the BIA. Plaintiffs were not allowed to testify in that proceeding, but they did provide written submissions making the same allegations against Haddam that they make here. The BIA decision indeed discusses some of the very evidence that plaintiffs offer here, namely, statements attributed to Haddam that condone violence, and information about the link between the GIA

and the FIS during 1994–1995. The plaintiffs were not parties to the BIA proceeding, however, *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), and they may not have had a full and fair opportunity to litigate the issues before the BIA, *Blonder–Tongue Lab., Inc. v. Univ. of Ill. Found.,* 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). The BIA ruling has no issue-preclusive effect.

## III. Standing

■ Haddam challenges the RAFD's standing to sue under the Alien Tort Claims Act.[5] His challenge must be sustained. The ATCA provides a cause of action in federal district courts to any "alien," but is silent on whether an organization can sue instead of an individual. There is no direct authority on this issue, but traditional principles of representational standing,[6] *e.g., United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996), are sufficient to decide the standing issues in this case.[7] Whether the RAFD has standing to sue depends on whether the claims against Haddam require individualized proof from each RAFD member. *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 602 (7th Cir.1993); *Hosp. Council v. City of Pittsburgh,* 949 F.2d 83, 89 (3d Cir.1991). The fact that the RAFD

---

5. Haddam's motion to dismiss the RAFD for lack of standing was rejected in an earlier stage of this litigation, *Doe v. Islamic Salvation Front,* 993 F.Supp. 3 (D.D.C.1998), but Judge Sporkin expressly declined to rule on whether a group can bring a claim under the ATCA. He allowed the RAFD to remain in the case because the individual plaintiffs had standing. *Id.* at 10.

6. An association has standing to bring suit on behalf of its members when: (a) its member would otherwise have standing to sue in their

own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

7. Plaintiffs' statement during oral argument that the RAFD was suing in its own capacity, rather than as a representative for its members, is contradicted by the pleadings in this case. *E.g.,* Amended Compl. ¶¶ 100–02.

seeks money damages is dispositive: it does not have associational standing, because individualized proof would be required from each member to determine the correct amount of damages if Haddam were found liable.

## IV. Subject matter jurisdiction [8]

■ The ATCA confers jurisdiction over actions for torts committed in violation of the law of nations [9] or a treaty of the United States. 28 U.S.C. § 1350. The law of this Circuit is unclear, however, as to whether the ATCA creates a cause of action [10] and whether the ATCA confers subject matter jurisdiction over claims against non-state actors. *See Tel–Oren v. Libyan Arab Republic*, 517 F.Supp. 542 (D.D.C.1981), *aff'd*, 726 F.2d 774 (D.C.Cir. 1984). In *Tel–Oren*, the Court of Appeals affirmed the dismissal for lack of subject matter jurisdiction of an ATCA action brought against various Arab and Palestinian organizations by victims of an armed attack on a civilian bus in Israel. The panel, however, issued three divergent opinions on why the dismissal was appropriate. Judge Edwards found that there was no liability under the ATCA for torture committed by non-state actors; Judge Bork opined that the ATCA did not grant a cause of action in the first place; and Judge Robb concluded that the action presented a nonjusticiable political question. *Tel–Oren*, 726 F.2d at 791, 795, 799, 823.

Even if the ATCA creates a cause of action and imposes liability upon non-state actors for certain acts, the only claim over which this Court has subject matter jurisdiction under the ATCA is that of Jane Doe II. Judge Edwards may or may not have been correct in his conclusion that the law of nations attributes individual liability for a "handful of crimes" without requiring state action, *Tel–Oren*, 726 F.2d at 795, but no court has found more in that "handful" than war crimes, crimes committed in pursuit of genocide, slave trading, aircraft hijacking, and piracy, *see Kadic v. Karadzic*, 70 F.3d 232, 240 (2d Cir.1995), and only Jane Doe II's claim, alleging Haddam's involvement in an airplane hijacking, can be found on that short list. Plaintiffs argue that their other allegations of Haddam's complicity in murder and threats committed by armed Islamic groups amount to allegations of war crimes and crimes against humanity, 2/3/03 Tr. at 50–52, but their contention stretches the meaning of war crimes and crimes against humanity under the law of nations too far and hinges on characterizing the violent conflict in Algeria between the Islamic insurgency and the government as "war"—a debatable point. Plaintiffs' submission, that any violence or threat against a civilian or "non-combatant" during an armed conflict should be considered a war crime or crime against humanity, is unsupported

---

**8.** Defendant's motion to dismiss for lack of subject matter jurisdiction was denied in an earlier stage of this case, *Doe v. Islamic Salvation Front*, 993 F.Supp. 3 (D.D.C.1998), but, since then, plaintiffs have voluntarily dismissed many of their initial claims. What remains is different enough from the original case to warrant reconsideration of the jurisdictional question.

**9.** The law of nations may be ascertained by "consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law." *Filartiga v. Pena–Irala*, 630 F.2d 876, 880 (2d Cir.1980) (quoting *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820)).

**10.** The Courts of Appeals for the Second Circuit and the Ninth Circuit have held that the ATCA does create a cause of action for torts committed in violation of the law of nations or a U.S. treaty. *Papa v. United States*, 281 F.3d 1004, 1013 (9th Cir.2002); *Kadic v. Karadzic*, 70 F.3d 232, 241 (2d Cir.1995).

by authority and is rejected.[11]

## V. Plaintiffs' evidence

Even assuming arguendo that jurisdiction could be exercised over all of the plaintiffs' claims, the evidence plaintiffs have offered to link Haddam to the alleged acts committed by armed Islamic groups is insufficient to avoid summary judgment. There is nothing in this record on which a jury could reasonably find for plaintiffs, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), regardless of whether international criminal law standards or federal common law standards are applied to the plaintiffs' claims of accomplice liability and conspiracy.[12]

The asserted links between Haddam and the acts committed by armed Islamic groups against civilians are much too tenuous to support of finding of liability. All ten of plaintiffs' declarations describe the effects on individuals of the horrific violence in Algeria and attribute blame to "Islamic fundamentalists," including the

FIS, but none offers more than conclusory statements about Haddam's alleged role.[13] The fact (if it is a fact) that Haddam served in a leadership capacity of the FIS when it was affiliated with violent groups, such as the GIA, from 1994 to 1995 does not link Haddam to any specific acts in the absence of evidence that he was a member of or had official contact with the GIA or the AIS. Haddam acknowledges that the GIA was part of the mujahidin between May 1994 and November 1995, and that the FIS supported the GIA's armed struggle against the military regime in order to restore elections. He states, however, that, once the GIA began killing civilians after November 1995, he disassociated himself from the GIA and other violent Islamic groups, and plaintiffs offer no facts to refute that statement. A communique alleged to have been written by the FIS and the AIS soliciting money from civilians and threatening, "If you told the police, we will know and you would have sentenced yourself with death because you have dealt with the 'tempters'," "Expert I" Decl. Ex.

---

11. Plaintiffs' assertion that 28 U.S.C. § 1331 gives rise to a cause of action is unavailing for the reasons explained in *Tel–Oren,* 726 F.2d at 779 n. 4. Plaintiffs also identified the Torture Victim Protect Act, 28 U.S.C. § 1350, note, as a basis for jurisdiction, but that Act is clearly inapplicable here, because, in contrast to the ATCA, the TVPA "contains explicit language requiring state action." *Doe v. Islamic Salvation Front,* 993 F.Supp. 3, 9 (D.D.C.1998). Plaintiffs have offered no facts showing that Haddam was a state actor or that the FIS was a de facto state.

12. District courts in the 11th Circuit have relied on decisions by the International Criminal Tribunal for the former Yugoslavia and Rwanda to adjudicate claims brought under the ATCA. *Barrueto v. Larios,* 205 F.Supp.2d 1325, 1333 (S.D.Fla.2002); *Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322, 1344 (N.D.Ga. 2002). The Ninth Circuit is teetering on the edge of such a ruling, *see Doe I v. Unocal Corp.,* —— F.3d ——, —— – ——, 2002 WL

31063976, at *12–13 (9th Cir.2002), *vacated and rehearing en banc granted by* 2003 WL 359787.

Tort principles from federal common law may be more useful. *Unocal Corp.,* —— F.3d at —— – ——, 2002 WL 31063976, at *26–35 (Reinhardt, J. concurring) (rejecting the majority's application of international law and urging application of federal common law to determine third party liability for tort claims against foreign defendants); Note, 116 Harv. L.Rev. 1525 (2003) (supporting Judge Reinhardt's position). *Cf. Bettis v. Islamic Republic of Iran,* 315 F.3d 325, 332–33 (D.C.Cir. 2003) (explaining that federal common law, instead of state tort law, has been used to analyze tort claims against foreign defendants in order to promote uniformity among federal courts trying cases against foreign defendants).

13. *See* Pls.' Opp'n to Mot. for Summ. J., Exs. 1–10.

M,[14] is of no probative value in the absence of any allegation that Haddam participated in its issuance or even knew about it.

Public statements by Haddam allegedly condoning violence against journalists and others who opposed an Islamic state do not help prove that he assisted or directed armed Islamic groups in carrying out the particular acts that affected the plaintiffs. The few specific examples that plaintiffs provide do tend to establish that Haddam rationalized violence or refused to believe that civilians were being targeted, but the statements themselves cannot be deemed tortious. Haddam suggested that the French military, instead of the GIA, was responsible for the December 24, 1994 airplane hijacking that is the subject of Jane Doe II's claim. "Expert I" Decl. at 21. His statement of refusal to believe that the GIA was responsible for the hijacking does not condone the act or admit to facilitating it. Haddam's expression of regret to the families of a car bombing in February 1995, stating that the armed groups that were responsible intended to attack a local police station, "Expert I" Decl., Exh. V, may be an admission that Haddam had knowledge or information about a specific act—but that act is not the basis of any claim remaining in this case. Plaintiffs emphasize a statement Haddam allegedly made during a July 12, 2001, interview suggesting that journalists were just as culpable for the violence in Algeria as the military and armed Islamic groups: "What about journalists who kill with words, who set the army against the people?" "Expert I" Decl. at 12. This particular statement, even if unapologetic about violence committed against journalists, was not a directive to target specific journalists. It was made, moreover, in 2001, several years *after* Jane Doe IX's husband, a journalist, was killed.

The only statement attributed to Haddam that does suggest his support for violence committed against civilians was allegedly made on May 6, 1994 during a newspaper interview:

> We have suggested to our brothers the Mujahidin to target those secular extremists who refused the choice of the Algerian people. It happens that among those there are university professors, journalists, politicians, military . . . [t]hat is why the order has been given to people to organize locally and target all of those who seized the state apparatus.

"Expert I" Decl. at 18. This statement demonstrates Haddam's justification of violence against civilians supporting the military regime. It does not support a conclusion that Haddam incited or facilitated the threats, injuries, or murders that are the focus of the plaintiffs' claims. This single statement does not create a material factual dispute, either alone or in conjunction with the fact that Haddam and the FIS supported armed struggle against the government.

Plaintiffs make a Rule 56(f) objection to the entry of summary judgment, supporting it only with the affidavit of Rhonda Copelon, who has been their lead attorney. Professor Copelon never really states why plaintiffs "cannot present facts essential to justify [plaintiffs'] opposition . . . ." Fed. R.Civ.P. 56(f). The parties have indeed mired themselves in the discovery disputes described above, but there has been no impediment to the discovery of non-parties during the six-year history of this case. During that period, the plaintiffs could have pursued much, if not most, of the discovery that Professor Copelon now wants to take, but they have not done so. In any case, most of Professor Copelon's proposals to take discovery would meet

---

**14.** Plaintiffs identify this declarant as "Expert I" and has offered the declaration under seal.

obvious governmental barriers, erected for reasons of bureaucracy, or secrecy, or both, and are on their face unlikely to lead to admissible evidence. It would be unreasonable to require Haddam, who has private counsel, to participate in and endure litigation with the State Department, Defense Department, the CIA, the FBI, and the National Security Council over the depositions Professor Copelon now wants to take and the subpoenas duces tecum she now wants to serve. The letter rogatory that Professor Copelon wants to send to the Government of Algeria are unlikely to uncover information of any kind, admissible or not, in view of the fact that an earlier letter rogatory was refused and a meeting with representatives of the chief prosecutor in Algiers was unsuccessful. Professor Copelon persists in her quest for information from and about Haddam's asylum proceedings, but here she is merely fishing, and fishing in waters unlikely to be productive, in view of the fact that the BIA rejected the plaintiffs' allegations against Haddam. And her desire to issue subpoenas to financial institutions, telephone companies, and the Justice Department's Office of International Litigation, in order to pursue her "information and belief" that Haddam is or has been involved in arms trafficking, is fishing in a different ocean. The only discovery Professor Copelon proposes that seems plausible is the deposition of Haddam himself, but, in the absence of even a scintilla of evidence directly linking Haddam to the airplane hijacking on December 24, 1994—the single claim of the remaining plaintiffs over which this Court has jurisdiction—such a deposition would be harassment.

## Conclusion

For the reasons set forth above, defendant's motion for summary judgment will be granted.

### ORDER

For the reasons stated in the accompanying memorandum, defendant's motion for summary judgment [# 141] is **granted** and plaintiffs' motion to compel discovery [# 145] is **denied**.