*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0102p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ANA CHAVEZ, CECILIA SANTOS, JOSE
CALDERON, ERLINDA FRANCO, and DANIEL
ALVARADO,

> *Plaintiffs-Appellees,*

v.

NICOLAS CARRANZA,

> *Defendant-Appellant.*

No. 06-6234

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 03-02932—Jon Phipps McCalla, Chief District Judge.

Argued: October 28, 2008

Decided and Filed: March 17, 2009

Before: SILER and McKEAGUE, Circuit Judges; LUDINGTON, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Robert M. Fargarson, Bruce D. Brooke, FARGARSON & BROOKE, Memphis, Tennessee, for Appellant. Matthew J. Sinback, BASS, BERRY & SIMS, Nashville, Tennessee, for Appellees. John C. Kiyonaga, ATTORNEY AT LAW, Alexandria, Virginia, for Amicus Curiae. **ON BRIEF:** Robert M. Fargarson, Bruce D. Brooke, FARGARSON & BROOKE, Memphis, Tennessee, for Appellant. David R. Esquivel, BASS, BERRY & SIMS, Nashville, Tennessee, for Appellees. John C. Kiyonaga, ATTORNEY AT LAW, Alexandria, Virginia, for Amicus Curiae.

---

[*]The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

———————————

## OPINION

———————————

SILER, Circuit Judge.   Defendant Nicolas Carranza appeals a jury verdict awarding compensatory and punitive damages to victims of torture, extrajudicial killing, and crimes against humanity in violation of the Alien Tort Statute (ATS), also called the Alien Tort Claims Act (ATCA) and the Torture Victims Protection Act (TVPA). Carranza argues that the district court abused its discretion by (1) holding that extraordinary circumstances justified equitable tolling of the statute of limitations, (2) not granting comity to the Salvadoran Amnesty Law, and (3) making various evidentiary rulings.   He also contends that the district court erred in its instruction to the jury on command responsibility.   We AFFIRM.

## BACKGROUND

From the 1930s to the mid-1980s, El Salvador was governed by a military dictatorship.   By the 1970s, opposition to the military's dominance increased.   In response, militant organizations, such as the Salvadoran Security Forces, carried out systematic repression and human rights abuses against political dissenters.  Civil unrest in the country resulted in a war which lasted from 1981 to 1992.

On January 1, 1992, the government of El Salvador and the Salvadoran guerilla forces signed a Peace Accord sponsored by the United Nations.  In March 1993, the Salvadoran legislature adopted an amnesty law precluding criminal or civil liability for political or common crimes committed prior to January 1, 1992. In March 1994, the first national elections were held after the end of the civil war.

Carranza spent nearly thirty years as an officer in the armed forces of El Salvador.  He served as El Salvador's Vice-Minister of Defense and Public Security from about October 1979 until January 1981.   While in this position, he exercised operational control over the Salvadoran Security Forces–comprised of the National Guard, the National Police, and the Treasury Police.  He also served as Director of the

Treasury Police from June 1983 until May 1984. In 1984, he became a resident of the United States. He moved to Memphis, Tennessee, in 1986 and has been a naturalized citizen since 1991.

Plaintiff Cecilia Santos was tortured and assaulted while in custody at the National Police headquarters in San Salvador. On September 25, 1980, she was arrested and accused of planting a bomb. She was taken to the headquarters of the National Police where she was electrocuted, physically tortured with acid, and had an object forced into her vagina. She spent 32 months in confinement.

On September 11, 1980, members of the National Police entered Plaintiff Jose Calderon's home, forced him to the ground, and murdered Calderon's father.

Plaintiff Erlinda Franco's husband, Manuel, was abducted, tortured, and killed in 1980. He was a professor at the National University and was a prominent leader of the Democratic Revolutionary Front (FDR). On November 27, 1980, he attended a meeting of FDR leadership in San Salvador. While at the meeting, members of the Security Forces abducted Mr. Franco and five other leaders of the FDR. Later that day, the bodies of Mr. Franco and the other five men were found. Each had visible signs of torture.

On August 25, 1983, Plaintiff Daniel Alvarado was abducted by members of the Treasury Police while attending a soccer game. He was accused of killing Lt. Cmdr. Albert Schaufelberger, a United States military advisor in El Salvador. After four days of torture, Alvarado confessed to killing Schaufelberger. Carranza presided over the ensuing press conference. After being held in custody for several weeks, Alvarado was questioned by members of the United States Navy and Federal Bureau of Investigation about the assassination of Schaufelberger. Alvarado was unable to provide accurate information about the assassination and subsequently explained that his confession was coerced through torture. After imprisonment for over two years, Alvarado fled to Sweden.

Plaintiffs filed suit against Carranza on December 10, 2003. Using a command responsibility theory, they claim that Carranza is liable for the acts of torture, extrajudicial killing, and crimes against humanity.

Carranza filed several motions during the course of the litigation, raising the same issues he argues on appeal: (1) the district court should not equitably toll the statute of limitations, and (2) the Salvadoran Amnesty Law bars plaintiffs' claims.

After trial, the jury found Carranza liable and awarded $500,000 in compensatory damages and $1 million in punitive damages to each plaintiff. However, the jury could not reach a unanimous verdict as to claims made by Plaintiff Ana Chavez. The district court declared a mistrial as to her claims, and those claims were later voluntarily dismissed.

## DISCUSSION

### I. Equitable Tolling of the Statute of Limitations

#### A.

Under the TVPA, plaintiffs have ten years from the date the cause of action arose to bring suit. 28 U.S.C. § 1350. However, the ATS does not specify a statute of limitations. When faced with this situation, courts should apply the limitations period provided by the local jurisdiction unless "a rule from elsewhere in federal law clearly provides a closer analogy than available state statutes, and when federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial lawmaking." *N. Star Steel Co. v. Thomas*, 515 U.S. 29, 35 (1995) (quoting *DelCostello v. Teamsters*, 462 U.S. 151, 172 (1983)).

Like all courts that have decided this issue since the passage of the TVPA, we conclude that the ten-year limitations period applicable to claims under the TVPA likewise applies to claims made under the ATS. *See Jean v. Dorelien*, 431 F.3d 776, 778-79 (11th Cir. 2005); *Papa v. United States*, 281 F.3d 1004, 1012-13 (9th Cir. 2002); *Doe v. Islamic Salvation Front*, 257 F. Supp. 2d 115, 119 (D.D.C. 2003).

The TVPA and the ATS share a common purpose in protecting human rights internationally. The TVPA grants relief to victims of torture, 28 U.S.C. § 1350, and the ATS grants access to federal courts for aliens seeking redress from torts "committed in violation of the law of nations." 28 U.S.C. § 1350. Both statutes use civil suits as the mechanism to advance their shared purpose and both can be found in the same location within the United States Code. *See Arce v. Garcia*, 434 F.3d 1254, 1262, n.17 (11th Cir. 2006); *Papa*, 281 F.3d at 1012.

Likewise, the justifications for the application of the doctrine of equitable tolling under the TVPA apply equally to claims brought under the ATS. Congress provided explicit guidance regarding the application of equitable tolling under the TVPA. The TVPA "calls for consideration of all equitable tolling principles in calculating this [statute of limitations] period with a view towards giving justice to plaintiff's rights." S. REP. NO. 102-249, at 10 (1991).

We have identified five factors a district court should consider when determining whether to equitably toll the statute of limitations: (1) lack of notice of the filing requirement, (2) lack of constructive knowledge of the filing requirement, (3) diligence in pursuing one's rights, (4) absence of prejudice to the defendant, and (5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement. *See Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 561 (6th Cir. 2000). However, "the propriety of equitable tolling must necessarily be determined on a case-by-case basis." *Id*. (quoting *Truitt v. County of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998)).

Again, Congress has provided explicit guidance as to when to apply the equitable tolling doctrine in TVPA cases:

> Illustrative, *but not exhaustive*, of the types of tolling principles which may be applicable include the following. The statute of limitations should be tolled during the time the defendant was absent from the United States or from any jurisdiction in which the same or similar action arising from the same facts may be maintained by the plaintiff, provided that the remedy in that jurisdiction is adequate and available. Excluded also from calculation of the statute of limitations would be the period

when a defendant has immunity from suit. The statute of limitations should also be tolled for the period of time in which the plaintiff is imprisoned or otherwise incapacitated. It should also be tolled where the defendant has concealed his or her whereabouts or the plaintiff has been unable to discover the identity of the offender.

S. REP. NO. 102-249, at 10-11 (1991) (emphasis added).

Courts that have addressed equitable tolling in the context of claims brought under the TVPA and ATS have determined that the existence of extraordinary circumstances justifies application of the equitable tolling doctrine. *See Arce,* 434 F.3d at 1259, 1262-63 (tolling the statute of limitations under the TVPA and ATS until the signing of the Peace Accord in 1992 because the fear of reprisals against plaintiffs' relatives orchestrated by people aligned with the defendants excused the plaintiffs' delay); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1155 (11th Cir. 2005) (tolling the statute of limitations under the TVPA and ATS "[u]ntil the first post-*junta* civilian president was elected in 1990" for claims brought against a Chilean military officer); *Hilao v. Estate of Marcos*, 103 F.3d 767, 773 (9th Cir. 1996) (tolling the statute of limitations for TVPA and ATS claims against former Philippine dictator Ferdinand Marcos until the Marcos regime was overthrown); *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1549 (N.D. Cal. 1987) (holding that the plaintiff raised an issue of fact as to whether the ATS statute of limitations should be tolled for claims against an Argentine military officer until a democratically-elected government was in place).

When the situation in a given country precludes the administration of justice, fairness may require equitable tolling. In such limited circumstances, where plaintiffs legitimately fear reprisals against themselves or family members from the regime in power, justice may require tolling. These circumstances, outside plaintiffs' control, make it impossible for plaintiffs to assert their TVPA and ATS claims in a timely manner. In such extraordinary circumstances, equitable tolling of TVPA and ATS claims is appropriate.

In sum, we conclude that the ten-year limitations period applicable to TVPA claims also governs claims under the ATS, equitable tolling principles apply, and the

existence of extraordinary circumstances provides a justification for the application of the equitable tolling doctrine.

B.

We review a decision on the application of equitable tolling de novo where the facts underlying the equitable tolling are undisputed. *Cook v. Comm'r of Soc. Sec.*, 480 F.3d 432, 435 (6th Cir. 2007). When the facts are in dispute, we apply an abuse of discretion standard. *Id.* Here, Carranza disputes plaintiffs' contention that facts and circumstances in El Salvador justify equitable tolling. Accordingly, we review the district court's decision for an abuse of discretion.

Each of the acts for which Carranza was held liable occurred more than ten years before plaintiffs filed suit. However, the district court determined that the pervasive violence that consumed El Salvador until March 1994 (when El Salvador held its first national elections following the signing of the Peace Accord) justified equitable tolling of the ten-year statute of limitations. These findings of fact are supported by the record.

The evidence established that widespread human rights abuses were carried out by the Salvadoran military against civilians during the country's civil war and that plaintiffs feared reprisals against themselves or their family members. Carranza held a position of power within the Salvadoran military regime.

In addition, the violence associated with the civil war continued after the signing of the Peace Accord in 1992 until at least March 1994, when the first national elections were held after the civil war. Plaintiffs submitted affidavits stating that even after they arrived in the United States, they were afraid that their families in El Salvador would be subject to repression or violence by the Salvadoran military. They also stated that they did not feel that it was safe for their families in El Salvador to bring suit until many years after the end of the civil war. Given this evidence, it was within the district court's discretion to toll the statute of limitations until March 1994.

Carranza argues that the district court abused its discretion in tolling the statute of limitations because plaintiffs did not introduce evidence at trial proving they feared

reprisals for bringing this lawsuit, and the plaintiffs were not aware of their right to bring a legal action during the period in which they feared reprisals by the Salvadoran military. Carranza's arguments fail.

First, the decision to invoke equitable tolling is a question of law. *Rose v. Dole*, 945 F.2d 1331, 1334 (6th Cir. 1991). The district court addressed and decided the equitable tolling issue in denying Carranza's motions to dismiss and for summary judgment. As such, the issue had been resolved prior to trial and no additional proof was required.

Second, equitable tolling was justified by extraordinary circumstances outside of plaintiffs' control, which made it impossible for plaintiffs to assert their claims in a timely manner. Whether the plaintiffs knew they had an actionable claim under United States law does not change the fact that at least until March 1994, the circumstances in El Salvador were not sufficiently safe for plaintiffs to seek redress in court.

The district court appropriately considered the documentary evidence and witness declarations in addressing the issue of equitable tolling when it considered and denied Carranza's motions to dismiss and for summary judgment. The district court did not abuse its discretion in finding extraordinary circumstances existed justifying the equitable tolling of the ten-year statute of limitations.

## II. Salvadoran Amnesty Law

The Salvadoran Amnesty Law was passed by the Salvadoran Legislature in order to provide amnesty to all those who participated in political or common crimes during the civil war in El Salvador before 1992. *See* Decreto Legislativo 486 de 3/22/93 Aprueba la Ley Sobre la Amnistía General para la Consolidación de la Paz [Legislative Decree 486 of 3/22/93 Approving the General Amnesty Law for Consolidation of the Peace], Diario Oficial, 23 de Marzo de 1993 (E.S.). The purpose of the Salvadoran Amnesty Law is "to reconcile and reunite the Salvadoran family by promulgating, and immediately implementing, legal provisions that protect the right of the entire

Salvadoran population to fully conduct its activities in harmony, and a climate of trust and respect for all social sectors."

Carranza claims that he is entitled to amnesty pursuant to the Salvadoran Amnesty Law.[1]  He argues that the district court erred when it declined to apply the Salvadoran Amnesty Law to plaintiffs' claims.  We review the district court's decision not to grant comity to the Salvadoran Amnesty Law for an abuse of discretion. *See*, *e.g.*, *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 178 (2d Cir. 2006); *Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V.*, 310 F.3d 118, 121-22 (3d Cir. 2002); *cf. Taveras v. Taveraz*, 477 F.3d 767, 783 (6th Cir. 2007) ("[T]he theory of comity can serve as a discretionary basis for a court to determine whether a foreign country court's judgment should be given preclusive effect.").

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).  In order for an issue of comity to arise, there must be an actual conflict between the domestic and foreign law. *Hartford Fire Ins. Co. v. Cal.*, 509 U.S. 764, 798 (1993).  There is no conflict for comity purposes "where a person subject to regulation by two states can comply with the laws of both." *Id*. at 799 (quoting RESTATEMENT (THIRD) FOREIGN RELATIONS LAW § 403 cmt. e (1987)).

There is no conflict between domestic and foreign law because the Salvadoran Amnesty Law cannot be interpreted to apply extraterritorially.  A statute must not be interpreted as having extraterritorial effect without a clear indication that it was intended

---

[1] It is not clear from the record whether Carranza is immune from suit under the Salvadoran Amnesty Law.  Article 4 of the law sets forth a series of procedures for a person to gain amnesty. According to Article 4, an unindicted person or a person wishing to benefit from the amnesty must file a motion or appear before a trial judge and request a certificate of amnesty.  It is unclear whether this process applies exclusively to criminal defendants or whether it is meant to apply to defendants in civil cases as well.

Nevertheless, there is no evidence in the record indicating that Carranza has a certificate of amnesty.  In any event, neither party has raised this issue and it does not impact our analysis of the extraterritorial application of the Salvadoran Amnesty Law, nor does it effect the outcome of this case.

to apply outside the country enacting it.  *BMW Stores, Inc. v. Peugeot Motors of Am.*, *Inc*., 860 F.2d 212, 215 n.1 (6th Cir. 1988).  There is nothing in the Salvadoran Amnesty Law to suggest that it should apply or was intended to apply outside of El Salvador.

Moreover, compliance with both domestic law and the Salvadoran Amnesty Law is possible.  Plaintiffs may be barred from filing suit in El Salvador, but they are not barred from filing suit in the United States.  Likewise, if Carranza were living in El Salvador, he would likely be immune from  suit.  However, he is a citizen and resident of the United States and is therefore subject to civil liability for his violations of the ATS and TVPA.  In addition, the Republic of El Salvador, as amicus, argues that this case would be rejected if it were brought in El Salvador– further demonstrating that Salvadoran courts can apply the Salvadoran Amnesty Law domestically without undermining the jurisdiction of United States courts.

Carranza's reliance on *F. Hoffmann-LaRoche v. Empagran*, 542 U.S. 155 (2004), is misplaced.  In *Empagran*, the Supreme Court interpreted an antitrust statute, the Foreign Trade Antitrust Improvements Act of 1982 (FTAI), which expressly places extraterritorial limits on the application of the Sherman Act.  With some exceptions, the FTAI provides that the Sherman Act "shall not apply to conduct involving trade or commerce . . . with foreign nations."  *Id.* at 158 (quoting 15 U.S.C. § 6a).  In reaching its conclusion, the Supreme Court did not address the ATS or TVPA, nor did it discuss international comity.  Therefore, *Empagran* is of little relevance to the law at issue in this case.

### III. Evidence at Trial

#### A. The Truth Commission Report

Carranza contends that the district court abused its discretion in admitting the Truth Commission Report into evidence.  Specifically, Carranza argues that the report is not timely and, therefore, is not trustworthy.

The Truth Commission Report was prepared by the Commission on the Truth for El Salvador, an entity established under the 1992 United Nations-sponsored peace

agreements between the Government of El Salvador and the Frente Farabundo Marti para la Liberación Nacional. The Truth Commission Report sets forth the factual findings that the Truth Commission discovered through its investigation of El Salvador– an investigation mandated by the peace agreements sponsored by the U.N. The district court admitted the Truth Commission Report into evidence under the Public Records and Reports exception to the hearsay rule.

Under the Public Records and Reports exception to the hearsay rule, reports of "public offices or agencies" setting forth "factual findings resulting from an investigation made pursuant to authority granted by law" are admissible "unless the sources of information or other circumstances indicate lack of trustworthiness." FED. R. EVID. 803 (8)(C). To determine whether a report is trustworthy, courts consider the following four factors: (1) the timeliness of the investigation upon which the report is based, (2) the special skill or experience of the investigators, (3) whether the agency held a hearing, and (4) possible motivational problems. *Bank of Lexington & Trust Co. v. Vining-Sparks Sec., Inc*., 959 F.2d 606, 616-17 (6th Cir. 1992).

Carranza claims that the Report is not timely because the investigation on which it was based did not begin until at least eight years after Carranza's association with the El Salvador military was over, and ended seven years after he moved to the United States. However, the timeliness factor focuses on how much time passed between the events being investigated and the beginning of the investigation. *See id.* at 617. Here, the Peace Accord was signed on January 1, 1992, and the Truth Commission began its investigation on July 13, 1992, seven months later. Therefore, the timeliness of the investigation suggests the Report is trustworthy.

Carranza also contends that the Truth Commission Report is untrustworthy because the commission did not hold a hearing. However, a formal hearing is not necessary when other indicia of trustworthiness are present. *Id.* Even though the Truth Commission did not conduct a formal hearing, it interviewed numerous witnesses, victims, and relatives associated with the events described in the Report. In addition, the Truth Commission reviewed thousands of complaints of acts of violence, examined

documents, interviewed members of the military, and visited locations of acts of violence.

For the foregoing reasons, the district court did not abuse its discretion in admitting the Truth Commission Report into evidence.

### *B. Testimony of Ambassador White and Professor Karl*

Carranza argues that the district court abused its discretion in allowing two of plaintiffs' expert witnesses, Robert White, former U.S. Ambassador to El Salvador, and Professor Terry Karl, the former Director of the Center of Latin American Studies at Stanford University, to testify. Carranza objects to several statements made by both experts as highly inflammatory and based on inadmissible hearsay.

Experts may base their testimony on inadmissible facts "of a type reasonably relied upon by experts in the particular field." FED. R. EVID. 703. Ambassador White's testimony was based on intelligence gathered by himself, his staff, and other government agents. Furthermore, Ambassador White was listed, without objection by Carranza, in the joint pretrial order as an expert witness. Professor Karl testified as to the levels of violence in El Salvador during the period of military control. Professor Karl relied upon interviews, commission reports (including the Truth Commission Report), documentary research, and field research to form her opinions. *See, e.g.*, *Katt v. City of New York*, 151 F. Supp. 2d 313, 356-57 (S.D.N.Y. 2001) (noting that interviews, commission reports, research articles, scholarly journals, books, and newspaper articles are the types of data reasonably relied upon by social science experts).

Carranza also contends that the district court improperly admitted testimony by Professor Karl. Carranza claims that Professor Karl should not have been permitted to testify about military procedures and command responsibility because she has never served in a military organization and she was never identified as a military expert.

Professor Karl's report contains a lengthy discussion of her opinions about Salvadoran military structure and Carranza's command responsibility. In her report, Professor Karl discusses her credentials as an expert in the politics of Latin America

including: the military strategies of both the Salvadoran military and security forces and the armed opposition, the command structure of the Salvadoran military, the corruption of the Salvadoran military and security forces, and the practice of death squads.

The district court did not abuse its discretion in allowing the jury to determine the weight to be given to the testimony of Professor Karl and Ambassador White.

### C. Embassy Cables

Carranza contends that Trial Exhibit 6 was improperly admitted into evidence because its purported author has disavowed authorship.

Trial Exhibit 6 is a United States government document describing a conversation in 1980 between a U.S. official and Salvadoran military officers in which Carranza "supported [a] line of thinking" that assassinations of political opponents should be accomplished whenever possible. Ambassador White testified that the author of this document was Colonel Brian Bosch, a U.S. military representative at the U.S. Embassy in San Salvador. Ambassador White used the contents of this document to support his testimony regarding the Salvadoran military's responsibility for the six FDR murders, the basis for Franco's claim. In a post-trial affidavit, Colonel Bosch claims he is not the author of this cable and that he has no personal knowledge of the statements attributed to Carranza.

Trial Exhibit 6 was admissible under Rule 803(6) of the Federal Rules of Evidence. Through the testimony of Ambassador White, the plaintiffs established a foundation that certain cables, including Trial Exhibit 6, were transmitted from United States governmental agents describing or recording events made at or near the time the acts took place by someone with personal knowledge of the acts. Ambassador White also testified that the cables were kept in the course of regularly conducted business of the United States governmental agency, and it was the regular practice of the agencies to make those records. Colonel Bosch's affidavit disputes that he is the author of Trial Exhibit 6 but it does not dispute its authenticity.

However, even if Trial Exhibit 6 was improperly admitted, it did not unfairly prejudice Carranza. The gravamen of the cable is the knowledge and approval of the assassination of the FDR leaders by members of the Salvadoran military, including Carranza. This was corroborated by several witnesses and exhibits at trial, including the testimony of Ambassador White and Professor Karl, as well as the Truth Commission Report and several other cables.

Carranza also argues that the copy of Trial Exhibit 6 he was provided with during discovery is illegible and highly redacted. Therefore, Carranza characterizes the cleaner copy of Trial Exhibit 6, provided to the jury by plaintiffs, as "previously undisclosed." This contention is without merit and is belied by the fact that plaintiffs provided Carranza with a copy of Trial Exhibit 6 during his deposition and Carranza was asked a number of questions about it.

## D. Photographs

Carranza argues that the district court abused its discretion when it admitted into evidence photographs depicting dead bodies and victims of military atrocities. Carranza contends that the photographs were unfairly prejudicial.

The photographs are relevant (1) to prove crimes against humanity and (2) to establish liability under a theory of command responsibility. They are relevant proof that the Salvadoran military was engaged in a systemic attack against civilians. The photographs also demonstrate that Carranza had notice of the human rights violations committed by his subordinates, as required for liability under a theory of command responsibility.

Although it is likely that the photographs had a substantial impact on the jury, the district court did not abuse its discretion in determining that the photographs' probative value was not substantially outweighed by the danger of unfair prejudice.

*E. Exclusion of Carranza's Expert*

Carranza contends that the district court abused its discretion in excluding the testimony of his expert witness, Dr. David Escobar Galindo. Dr. Galindo's testimony would have centered on the purposes behind the Salvadoran Amnesty Law as well as its application to plaintiff's claims against Carranza. As the district court properly declined to grant comity to the Salvadoran Amnesty Law, testimony regarding how the Salvadoran Amnesty Law would apply to Carranza is not relevant and, therefore, not helpful.

An expert opinion on a question of law is inadmissible. *Berry v. City of Detroit*, 25 F.3d 1342, 1353-54 (6th Cir. 1994). Dr. Galindo's testimony would have addressed whether the Salvadoran Amnesty Law prohibits U.S. courts from exercising jurisdiction over plaintiffs' claims. This is a legal question and not one which should be presented to a jury. Therefore, the district court did not abuse its discretion in excluding Dr. Galindo's testimony.

Carranza also argues that the district court erred in not allowing Dr. Galindo to offer factual information of circumstances in El Salvador. However, Dr. Galindo was not proposed as a fact witness until four days prior to trial. Nevertheless, plaintiffs agreed to stipulate to those facts that were disclosed in Dr. Galindo's expert report. Carranza did not introduce those facts.

*IV. Jury Instructions on the Law of Command Responsibility*

Finally, Carranza argues that the district court erred in its instructions to the jury on the law of command responsibility. Specifically, he contends that the jury should have been instructed on proximate cause.

Three elements must be established for command responsibility to apply: (1) a superior-subordinate relationship between the defendant/military commander and the person or persons who committed human rights abuses; (2) the defendant/military commander knew, or should have known, in light of the circumstances at the time, that subordinates had committed, were committing, or were about to commit human rights

abuses; and (3) the defendant/military commander failed to take all necessary and reasonable measures to prevent human rights abuses and punish human rights abusers. *See Ford v. Garcia*, 289 F.3d 1283, 1288 (11th Cir. 2002).

The law of command responsibility does not require proof that a commander's behavior proximately caused the victim's injuries. *See Hilao*, 103 F.3d at 776-79 (proximate cause is not an element of command responsibility). This conclusion is in accord with the legislative history of the TVPA:

> [A] higher official need not have personally performed or ordered the abuses in order to be held liable. Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts - anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them.

S. REP. NO. 102-249, at 9 (1991) (footnote omitted). Any question as to whether an injury was caused by a commander's act or omission can be resolved by a finding of liability under the elements of command responsibility.

Accordingly, plaintiffs were not required to submit proof of proximate cause in order to succeed on their claims under the law of command responsibility, and the district court was not required to instruct the jury on this issue.

AFFIRMED.