NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0326n.06

No. 15-3378

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 15, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| TRACY JONES, Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | On Appeal from the United States |
| KIM JONES, Individually and as | ) | District Court for the Northern |
| administrator of the estate of Bryan Jones, | ) | District of Ohio |
| Deceased and Tracy Jones, Deceased, | ) | |
| | ) | |
| Plaintiff - Appellant | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SANDUSKY COUNTY, OHIO; | ) | |
| SANDUSKY COUNTY BOARD OF | ) | |
| COMMISSIONERS; KYLE OVERMYER, | ) | |
| Sheriff, Sandusky County; JOSE CALVILLO; | ) | |
| MARIO CALVILLO, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

_____/

**Before: GUY, BOGGS, and COOK, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** This appeal follows a jury trial and entry of

judgment in favor of the defendants with respect to federal and state law claims arising out of the

shooting death of Bryan Jones, age 26, in the home he shared with his parents. The district court

denied the motion for new trial filed by plaintiff Kim Jones, individually and as administrator of

the estates of her son Bryan and her husband Tracy Jones (who died during this litigation).

Plaintiff appeals from that decision, arguing for a new trial on the grounds that her claims were prejudiced by three evidentiary rulings, improper comments by defense counsel during closing argument, and the district court's error in responding to a question from the jury concerning its consideration of the wrongful death claim against Sheriff Overmyer. For the reasons that follow, we affirm.[1]

**I.**

After defendants' interlocutory appeal from the denial of qualified immunity was denied, *Jones v. Sandusky County*, 541 F. App'x 653 (6th Cir. 2013), the district court bifurcated the issues of liability and damages and conducted a five-day jury trial in October 2014. The jury returned its verdicts in favor of the defendants using interrogatories to guide its findings on the claims of excessive force in violation of the Fourth Amendment brought under 42 U.S.C. § 1983 and for wrongful death under Ohio law. After judgment was entered accordingly, the district court denied plaintiff's motion for new trial.

Bryan Jones was fatally shot at approximately 11:30 p.m., on Sunday, July 11, 2010. Earlier that afternoon, concerned that Bryan's drinking was out of control, his parents, Kim and Tracy Jones, called family members and sheriff deputies to the house. The deputies talked with Bryan, who agreed to leave with a friend and not return until the next day. Kim Jones went to spend the night with her mother and sister, Sherry Keller, at her mother's house. Later, Tracy Jones prepared to go to his night-shift job and found that Bryan had returned. They had a confrontation and Tracy went to call 911 from another son's nearby home. As the district court summarized:

> Tracy Jones called police dispatch [at approximately 9:45 p.m.] and relayed that
> Bryan had been abusing alcohol for several days, had threatened to kill his

---

[1]Plaintiff has abandoned her challenge to the directed verdict entered on the claim for intentional infliction of emotional distress.

mother, told his father to [go ahead and] call the police and that he, Bryan, would "fight."

Arriving after dark, sheriff deputies observed Bryan, through an exterior first floor window, sitting on the living room couch with [his eyes closed,] a pump-style shotgun resting on his lap and his feet resting on a coffee table. The living room lay at the north end of the home, with a computer room adjoining to the south, and a kitchen further south.

[Sheriff Overmyer heard the call over the radio and remembered that Bryan had a prior conviction for shooting an occupied dwelling. Overmyer had the area secured and called the four-member Sandusky County Tactical Response Team ("TRT"), which included Deputies Jose and Mario Calvillo (who are brothers). Dispatch attempted to make contact with Bryan by calling the house, but there was no answer.]

Bryan sat facing the deputies' vantage point. For the next 90 minutes, the deputies observed Bryan in the same posture; he made few movements. One deputy speculated that Bryan may have been dead (he was not). Sheriff Overmyer eventually ordered [the TRT] into the home.

Around 11:30 PM, the TRT entered the home through the unlocked exterior kitchen door. Their plan: after a stealth entry into the kitchen, the deputies would "stack up" alongside the wall separating the kitchen from the computer room. Then, Deputy Kevin Karns would lob a flashbang grenade across the computer room and into the living room. At the same time, Fremont Police Sergeant Anthony Emrich, standing outside the home at the living room's north window, would shatter that window with his asp, a type of telescoping baton. Both the flashbang and shattered window were intended to distract and disorient Bryan.

With guns drawn and shouting commands such as "Drop it!," three of the four TRT members would then rush Bryan, either as a show of force in hopes that he would drop the shotgun or to physically subdue him. Mario Calvillo, first in line, carried a ballistics shield and a handgun. TRT team leader Jose Calvillo, second in line, held an M16 rifle in both hands. Karns, last in line, carried a carbine; Karns had attached the carbine to his bullet-resistant vest with a lanyard-like device, leaving [his] hands free to manipulate the flashbang. Deputy Allen Dorsey would remain in the kitchen as a rearguard.

The TRT executed the entry plan, which ended with both Calvillos fatally shooting Bryan, who died just before midnight, despite attempts by emergency responders to save his life.

The jury heard conflicting evidence on whether the flashbang startled Bryan from sleep, whether he raised the shotgun toward the deputies, and whether

the smoke from the flashbang made it difficult to determine if Bryan's movements were harmless or threatening. Kim Jones claimed errors in the police response resulted in the needless killing of her son. Defendants claim that, as the TRT entered the living room, Bryan swung the shotgun barrel in the TRT's direction and "racked" the shotgun (also called "pumping" or "ratcheting" . . . ). Mario Calvillo claimed he was so certain Bryan would shoot him that he braced for the impact of a shotgun blast. No party disputes that Defendants believed the shotgun was loaded—during his 911 call, Tracy told dispatch there were loaded guns in the home, and dispatch relayed that information to the deputies. In fact, the shotgun was *not* loaded.

Prior to the TRT entry, deputies called Tracy to the scene. Tracy offered to talk Bryan into laying down the shotgun, but deputies declined the offer, citing the threat Bryan posed. Separately, Kim and her sister approached the home, but a park ranger positioned at the end of the Jones driveway prevented them from proceeding further, at least in part because Bryan had threatened Kim's life. When the sisters heard an explosion and gunshots, they ran past the ranger; Keller, along with Tracy [Jones], claimed they heard Bryan cry "Why!?" before he was shot.

*Jones v. Sandusky Cnty., Ohio*, 96 F. Supp. 3d 711, 714-15 (N.D. Ohio 2015). Plaintiff's expert witness, David Van Blaricom, offered a number of criticisms of the tactics, timing, and planning of the entry; while defendants' expert, James Scanlon, opined that defendants' actions were reasonable given the lack of observed movement and the potential threat posed under the circumstances.

The jury rejected the § 1983 claims against both Jose and Mario Calvillo for the use of excessive force either by using the flashbang device or by shooting Bryan Jones. As a result, the jury was instructed not to answer the interrogatories relating to the § 1983 claims against Sheriff Overmyer for directing the use of excessive force (individual liability), and for failure to train resulting in the use of excessive force (official capacity). The jury also found for defendants on the state-law claims for wrongful death against Jose Calvillo, Mario Calvillo, and Sheriff Overmyer, which required proof that the defendant acted wantonly or recklessly to cause Bryan's death in order to overcome immunity under Ohio law. *See* OHIO REV. CODE § 2744.03(A)(6).

The jury found that plaintiff had not proved the claim for wrongful death against either Jose or Mario Calvillo; but, as instructed, did not answer the question of whether plaintiff proved wrongful death against Sheriff Overmyer. This is the basis of plaintiff's first claim on appeal.

## II.

The denial of a Rule 59(a) motion is reviewed for an abuse of discretion, which occurs when a district court "relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 405 (6th Cir. 2006) (citing *In re Brown*, 342 F.3d 620, 627 (6th Cir. 2003)); *see also* FED. R. CIV. P. 59(a)(1). We will find an abuse of discretion only when the court is left with "a definite and firm conviction that the trial court committed a clear error of judgment." *Mike's Train House*, 472 F.3d at 405 (quoting *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994)).

### A.      Jury Question

"This court reviews a district court's 'actions in responding to questions from the jury' for abuse of discretion." *United States v. Davis*, 490 F.3d 541, 548 (6th Cir. 2007) (quoting *United States v. August*, 984 F.2d 705, 712 (6th Cir. 1992) (per curiam)). "A jury instruction which states the law with substantial accuracy and fairly submits the issues to the jury will not provide grounds for reversal." *Clarksville-Montgomery Cnty. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1003 (6th Cir. 1991). Judgment will be reversed "only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72-73 (6th Cir. 1990).

Plaintiff contends that the district court improperly prevented the jury from considering the wrongful death claim against Sheriff Overmyer by answering "no" to the second question asked by the jury regarding the wrongful death claims. The jury first asked whether, if they

found that plaintiff had not proved the claim of wrongful death against the Calvillos (Question #5), they should answer the questions about whether Jose or Mario Calvillo had proved self-defense (Question #6). With the agreement of counsel, the district court answered "no" because if neither of the deputies was liable for wrongful death, it would not be necessary to decide whether he had proved that he acted in self-defense. *Jones*, 96 F. Supp. 3d at 721.

The jury also asked: "If we didn't have to answer #6 for the Calvillo[s], do we have to answer #4 on the form for Mr. Overmyer?" The district court answered "no," this time over plaintiff's objection, because no scenario had been presented that would allow the jury to find in favor of the deputies but against the sheriff on the claims for wrongful death. *Id*. at 722. Importantly, it is clear that this ruling was based on an assessment of the evidence; not a mistaken belief that the sheriff's liability depended on his position as a supervisor. Also, there is no dispute that the jury was properly instructed that, in contrast to the § 1983 claims, it could consider all of the events leading to the fatal shooting in deciding the claims for wrongful death.

Plaintiff argues that there was evidence from which the jury could have found that Sheriff Overmyer acted "recklessly" to cause Bryan's death—*i.e.*, that he perversely disregarded a known risk. *See O'Toole v. Denihan,* 889 N.E.2d 505, 517 (Ohio 2008). To be sure, plaintiff's expert witness opined that the TRT's entry was unnecessary, or at least premature, and should not have been undertaken as a stealth entry or using a flashbang device. The issue is not whether there was a question for submission to the jury—the district court found that there was—but, rather, whether that evidence would permit the jury to find that Sheriff Overmyer acted recklessly to cause Bryan's death if both Jose and Mario Calvillo had not.

To show the jury could have, plaintiff points to evidence that Sheriff Overmyer was in command, made the decision to go in, and gave the order approving the TRT's stealth entry

using the flashbang device. However, the evidence showed, and plaintiff argued at trial, that although Sheriff Overmyer gave the orders, the planning was done in consultation with, and with the active participation of, TRT Leader Jose Calvillo, Chief Deputy Sheriff Hirt, and Fremont Police Sgt. Emrich. Jose Calvillo also testified that he was involved in drawing up the entry plan that was approved by Sheriff Overmyer, and that it was his idea to use the flashbang device. Mario Calvillo said he was not involved in the discussions with Sheriff Overmyer, but Mario approved of and executed the stealth entry. The district court did not err in concluding the jury could not find that the sheriff had acted recklessly to cause Bryan's death if it found plaintiff had not proved the claim against either of the Calvillos. The district court's response to the jury's question did not make the instructions, as a whole, confusing, misleading, or prejudicial.

## B.   Evidentiary Rulings

Applying an abuse-of-discretion standard to the district court's evidentiary rulings, we review the district court's factual determinations for clear error and its conclusions of law *de novo*. *CFE Racing Prods., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 584 (6th Cir. 2015). "An erroneous evidentiary ruling amounts to reversible error, justifying a new trial, only if it was not harmless; that is, only if it affected the outcome of the trial." *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 510 (6th Cir. 2013).

### 1.   Unloaded Shotgun

Plaintiff claims the district court erred by prohibiting reference at trial to the fact that Bryan's shotgun was, in fact, not loaded. There was never any dispute that the defendants thought Bryan held a loaded shotgun and only later discovered that it was not loaded. The district court properly recognized that this fact should not be considered when judging the use of force from the perspective of a reasonable officer on the scene "rather than with the 20/20 vision

of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Nor would this unknown fact show that defendants acted recklessly for purposes of the wrongful death claims.

Plaintiff argues that this fact should have been admissible to refute the opinion of defendants' expert witness, James Scanlon, regarding "Bryan's state of mind." But, rather than testifying to Bryan's subjective intent, Scanlon opined that the entry plan was appropriate given the information available—including that Bryan told his father to call the police and then got a shotgun and sat on the couch facing the direction from which the officers would come. Plaintiff did not suggest at trial that Scanlon's testimony "opened the door" to the fact that the gun was unloaded. And, Scanlon conceded during cross-examination that he could not know what Bryan's intent was and only assumed that Bryan had expected his father would call the police. Finally, Scanlon's opinion was not inconsistent with the fact that the shotgun turned out to be unloaded. *Jones*, 96 F. Supp. 3d at 717.

Plaintiff also argues that she should have been able to challenge the deputies' credibility by pointing out that it would have been completely illogical for Bryan to deliberately point an unloaded shotgun at them. The probative value of this impeachment evidence would have been minimal and, in this context, the value would be outweighed by the real danger that the fact would be considered for an improper purpose (*i.e.*, that Bryan did not actually pose an imminent threat of serious bodily harm). *Id*. The district court did not abuse its discretion in this regard.

### 2.    Jose Calvillo's Prior Discipline

The district court granted defendants' motion in limine precluding plaintiff from offering evidence or eliciting testimony concerning prior disciplinary action taken against Jose Calvillo. Rule 404(b)(1) prevents other-acts evidence from being offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

FED. R. EVID. 404(b)(1). The district court found that the probative force of the evidence was to show his propensity to use "his position as a deputy to intimidate others," to "exhibit[] poor impulse control," or to "deny the inappropriateness of his behavior." Nor has plaintiff made a showing on appeal that the evidence should have been admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2); *see also United States v. Hardy*, 643 F.3d 143, 150 (6th Cir. 2011) (stating test for admission under Rules 404(b)(2) and 403).

Plaintiff argued that the disciplinary records were admissible for the purpose of attacking Jose Calvillo's credibility because he disputed the facts and still believed his conduct did not warrant disciplinary action. Except for certain criminal convictions, however, "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." FED. R. EVID. 608(b). To the extent that plaintiff sought only to inquire into the records on cross-examination, Rule 608(b) provides that the district court may allow inquiry into specific instances of conduct "if they are probative of [the witness's] character for truthfulness or untruthfulness." *Id.*

Calvillo was disciplined on three occasions: (1) in September 2007, for insubordination after refusing to stay away from his wife during their divorce; (2) in June 2009, after an altercation with a man and a taxi driver over a woman during a night out; and (3) in November 2009, for conduct unbecoming an officer when a former girlfriend complained that he was stalking her. In denying the motion for new trial, the district court found that, "at best, his prior disciplinary history marginally reflects his character for truthfulness," and that, "while no party disputes Jose Calvillo was in fact disciplined for these prior events, the conduct that led to this discipline is highly disputed." *Jones*, 96 F. Supp. 3d at 719. The district court added that it

would have barred inquiry under Fed. R. Evid. 403 because the questions would have posed a risk of jury confusion. *Id.* The district court did not abuse its discretion in concluding that exclusion of this evidence did not warrant a new trial.

### 3.    Consolo's Internal Investigation

Detective Captain James Consolo was called to the scene to conduct an internal investigation of the shooting as required by the Sheriff's Office Policy and Procedure Manual.[2] Consolo's report consisted of a narrative summary of the information gathered, a detailed timeline, and notes of his activities during the investigation. An additional two-page statement containing Consolo's opinions was removed before the report went to a review panel. The district court granted defendants' motion to exclude both the report of his investigation and his opinions for reasons that included hearsay, lack of foundation for certain opinions, and concern that the relevance was outweighed by unfair prejudice. Plaintiff argues that the exclusion of this evidence warrants a new trial.

Wholesale exclusion of this evidence on hearsay grounds was error. Rule 803(8) provides that the following is not excluded under the hearsay rule: "A record or statement of a public office if: (A) it sets out . . . (iii) in a civil case . . . factual findings from a legally authorized investigation; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." FED. R. EVID. 803(8)(A)(iii) and (B) (formerly Rule 803(8)(C)); *see Bank of Lexington & Trust Co. v. Vining-Sparks Sec., Inc.*, 959 F.2d 606, 616 (6th Cir. 1992) (identifying non-exclusive list of four factors to consider in determining whether such a report is trustworthy). First, although defendants argued otherwise below, the personal-knowledge requirement does not apply to reports admissible under the

---

[2]Under those policies, incidents of the use of force resulting in serious injury or death are investigated by the detective bureau, the incident report is reviewed by a panel of deputies, and then the review report is submitted to the sheriff for internal use.

public-records exception found in Fed. R. Evid. 803(8). *See Combs v. Wilkinson*, 315 F.3d 548, 555-56 (6th Cir. 2002). Second, the district court overlooked the fact that the statements incorporated from interviews with the defendants themselves and other employees or agents of the Sheriff's Office would not be hearsay under Fed. R. Evid. 801(d)(2)(A) and (D). Third, even those portions of the report consisting of conclusions or opinions formed as a result of a factual investigation are admissible under Rule 803(8). *See Alexander v. CareSource*, 576 F.3d 551, 561-62 (6th Cir. 2009) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988)).

Although defendants argued that the report was incomplete, the opinions were rendered without authority, and certain statements lacked foundation, the district court did not make a determination concerning trustworthiness under Rule 803(8)(B). Instead, in denying the motion for a new trial, the district court assumed that the exhibits were admissible and concluded that plaintiff failed to show that the error was not harmless. *Jones*, 96 F. Supp. 3d at 720. Review of the trial transcript supports the district court's conclusion.

Plaintiff has not attempted to identify prejudice or refute the district court's assessment that: "The jury learned much (if not all) of the evidence summarized in the Report through the firsthand testimony of witnesses and related exhibits." *Id*. There is every indication that admission of the summaries of his interviews and his timeline would have been cumulative and consistent with the evidence admitted at trial. In fact, where there was an inconsistency, Deputy Allen Dorsey was impeached with the statement he gave to Consolo indicating that he could only see Bryan's feet when he looked in the window. Also, Sgt. Emrich acknowledged "that he told Consolo that he made a 'bad move' by placing himself at a cross-fire window." *Id*.

In reply, plaintiff contends that Consolo's opinions that the entry was "rushed and premature" and that use of the flashbang was a "poor tactical decision" were relevant. Although

true, the record shows that these conclusions were fully presented to the jury through plaintiff's expert, the accompanying computer animation, and cross-examination of the defendants and defendants' expert witness. To the extent plaintiff argues the report would have undermined the claim that medical need motivated the decision to go in, Consolo was allowed to testify that, when he arrived on the scene, Sheriff Overmyer told him only that the TRT went in "to end a standoff." And the issue of whether concern for Bryan had been a consideration was fully presented at trial. In addition, Consolo was allowed to testify both that he listened to the 911 call fifty times and did not hear mention that Bryan was suicidal, and that he observed burn marks indicating that the flashbang detonated within five feet of where Bryan was sitting. Because plaintiff has not demonstrated that exclusion of Consolo's report and opinions affected the outcome of the trial, it was not an abuse of discretion to conclude that a new trial was not warranted.

## C.      Defense Counsel's Closing Argument

To be granted a new trial on the grounds that defense counsel made inappropriate comments during closing argument, plaintiff "must show both that the closing argument was improper and that [plaintiff] was prejudiced by the impropriety, that is, that there is a reasonable probability that the jury's verdict was influenced by the improper argument." *Fuhr v. Sch. Dist. of City of Hazel Park*, 364 F.3d 753, 760 (6th Cir. 2004). Plaintiff did not object to those comments at trial, which "raise[s] the degree of prejudice which must be demonstrated in order to get a new trial on appeal." *Clark v. Chrysler Corp.*, 436 F.3d 594, 609 n.19 (6th Cir. 2006) (quoting *Strickland v. Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998)).

The comment that raises the most obvious concern was defense counsel's reference to the shotgun as "loaded." But, it is eminently clear from the context that defense counsel was not saying the shotgun was in fact loaded. Specifically, defense counsel argued:

> as [Dispatcher] Pam Carper explained, when a highly intoxicated subject who has threatened to murder his mother says he will fight, fight to the end, it's reasonable to conclude he's suicidal. After all, what does fight to the end mean except that Bryan Jones is going to fight it out with a loaded gun he has in his hands. Pam would not be doing her job if she failed to inform the responding officers that the subject is both homicidal and suicidal.
>
> And of course the second point, what matters is what the responding officers were told. Based upon the communication [from] dispatch, they had to consider both the possibility that Bryan Jones might kill people other than himself and he might kill himself.

The comment was part of a permissible argument about the evidence in response to plaintiff's argument that the dispatcher had not been told Bryan was suicidal.

Nor was it improper for defense counsel to argue that Bryan had "racked the shotgun." There was testimony from Trooper Nunez—however incredible—that he heard the sound of a shotgun rack after the flashbang and before other shots were fired. It was not improper to argue inferences from the evidence. And, given that there was no shortage of grounds to attack that testimony since he claimed to have heard it from 100 yards away when no one else heard it and neither of the Calvillos said they saw it, there is no reasonable probability that the jury's verdict was influenced by defense counsel's statement.

Finally, plaintiff argued that defense counsel made several improper comments during closing argument speculating about what Bryan Jones was thinking (*i.e.*, that he was "wanting" or "intending" to provoke a confrontation). However, as the district court concluded, these comments were not improper speculation about Bryan's state of mind. For example, responding to the suggestion that the deputies should have known Bryan was harmless, defense counsel

argued: "The truth is the only relevance that earlier call to the Jones house has to this case is that [it] partly explains why Bryan was so angry that he would threaten to kill his mother[.]" It was also permissible to argue that the jury could infer from Bryan's actions suggesting he wanted or intended to provoke a confrontation with police that he had raised the shotgun at the deputies (*i.e.*, "They are the actions of a man ready and willing to provoke a confrontation"; "Who else was he waiting for but the cops?; "Lie and wait for the cops he knew would be coming. Bryan Jones positioned himself and that shotgun in a way that would provoke the very confrontation he told his father he wanted."). Plaintiff has not demonstrated that defense counsel's comments during closing argument warranted a new trial.

**AFFIRMED.**