NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0364n.06

No. 21-5477

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 02, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| GARY SIMPKINS, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| BOYD COUNTY FISCAL COURT, et al., | ) | DISTRICT OF KENTUCKY |
| Defendants-Appellees. | ) | OPINION |
| | ) | |

Before: BATCHELDER, ROGERS, and WHITE, Circuit Judges.

WHITE, J., delivered the opinion of the court in which ROGERS, J., joined. BATCHELDER, J. (pp. 28–35), delivered a separate opinion concurring in part and dissenting in part.

**HELENE N. WHITE, Circuit Judge.** Plaintiff-Appellant Gary Simpkins appeals the grant of summary judgment to Defendants-Appellees Boyd County Fiscal Court and Boyd County Officials (together "Boyd County") in this § 1983 excessive-force and municipal-liability case. Simpkins argues that the district court erred in three ways: (1) by holding that Boyd County Fiscal Court is not an entity that can be sued; (2) by excluding from evidence a 2019 Department of Justice Report as "irrelevant and inadmissible"; and (3) by granting summary judgment to Boyd County on the basis that Simpkins provided no evidence to support his theory of municipal liability. Because the district court erred in excluding the Report and in granting summary judgment without considering it, we VACATE and REMAND.

**I.**

**A.**

On September 12, 2018, just before midnight, Officer Ramey of the Catlettsburg Police Department stopped Simpkins for speeding in Catlettsburg, Kentucky. Simpkins told Ramey that he was speeding because he was experiencing chest pain and felt he needed to get to the emergency room quickly. During the stop, Ramey learned that Simpkins had an outstanding arrest warrant from another county for "harassing communications." R. 13-2, PID 64. Ramey arrested Simpkins and took him to the hospital, where an examining physician determined that Simpkins was not experiencing a medical emergency. The physician diagnosed Simpkins with "atypical chest pain" and discharged him in "stable condition." R. 18, PID 156.

Ramey then took Simpkins to the Boyd County Detention Center (BCDC), where he was booked and screened at approximately 4 a.m. on September 13, 2018. On the screening questionnaire, Simpkins indicated that he had "a serious medical condition that may require attention" (cancer), that he was "currently taking a prescription medication that may need continuation," and that he had "a serious mental health condition that may need attention." *Id.* at 164. He also answered "yes" to the questions "[h]ave you ever had a closed head injury that resulted in a permanent disability," "[d]o you have learning or other disabilit[ies] that will impact your ability to understand instructions while you are here," "[a]re you aware of any reason you should be separated from another inmate while you are here," "[h]ave you ever attempted suicide," and "[a]re you currently thinking about suicide." *Id.* Simpkins testified that he asked for his

medication from the person who "booked [him] in, and they said they'd work on trying to get it for [him]."[1]  R. 15, PID 96.

Simpkins was then placed in a cell with two other inmates.  Simpkins testified that he again asked for his medicine, saying "I need my medicine.  I can't think straight.  I'm getting dizzy.  I need my medicine." *Id.* at 92.  Simpkins beat on the door to get the guards' attention and repeatedly pressed the call button inside the cell.  A guard responded and told Simpkins to "sit down and shut up." *Id.*  When Simpkins persisted in asking for his medicine, he was removed from the cell and taken into D-Block, where there were approximately five other inmates.

At some point, one of the other inmates in D-Block informed BCDC staff that Simpkins had threatened to kill himself.  Officers removed Simpkins from the cell, took him back to booking, stripped off his clothes, and dressed him in a paper smock.  Simpkins was then placed in a cell by himself and monitored by the staff.  When he continued to request his medicine, Deputy Layne[2] placed him in a restraint chair, which the Kentucky Jail Policy Manual defines as "[a] chair specifically designed to restrain a prisoner's arms, legs, shoulders, and chest while in a seated position." R. 18, PID 189.  Simpkins described being placed in the chair as follows:

> [A red-headed skinny guy brought me] down the hallway he stopped and slammed my head up against the wall right beside of a door that had a man sitting in there on the computer.  He slammed my head up against that wall and said, "You keep your head right there," and then he put gloves on, they was black leather and just started beating me (sound effects) in the side.  I started screaming, "Why are you doing me this way," and then they took me in there, stripped me down, put me in a paper dress, and they put me in a chair, and then they strapped me right across the neck like that as tight as they could get it and right across the wrist and then they pushed me in this little room and then they turned it backwards and slammed it down [so I

---

[1] Simpkins stated in his deposition that his known medical conditions at the time of arrest were Crohn's disease, hepatitis, scar tissue in the brain, acid reflux, kidney stones, colon cancer, and issues with blood pressure.  He took medication for all these conditions.  However, it is unclear from Simpkins's deposition which medication he requested while at BCDC, or whether BCDC staff ever inquired (or were informed) about Simpkins's medications beyond what they learned from his initial intake questionnaire.

[2] Identified in the deposition as "Lane."

> was on my back] and said "Now, bitch." And I got to where I couldn't breathe. I said, "Please help me. I can't breathe." And then that's when this Officer [Kouns] started saying, "Scream bitch, scream."

R. 15, PID 94–95. Simpkins testified that he passed out in the chair, and awoke to "a little short chubby guy, black headed, [who] says – he bends over and picks me up and [said] . . . "I'm so thankful somebody come and got you because [the officer who strapped you in the chair] had intention of killing you today." *Id.* at 103. Simpkins's uncle then bonded him out of jail.

The only other record concerning the alleged beating and the restraint chair is an Incident Report, prepared by Deputy Layne, which described the events of September 13th as follows:

> On 9-13-2018 at approximately 1:00 pm, Deputy Kouns informed me that Inmate Simpkins was continually pressing the button harassing Deputy Kouns. I had already informed him twice that he was not to press the button except in case of emergency but he continued. I escorted him to D Block for 3 days for disrespect of staff and he was placed in Cell D-4.

> Immediately after exiting D Block, Deputy Kouns notified me that Inmates that were on Rec in D Block stated that Inmate Simpkins had threatened suicide. Deputy Payne immediately responded and escorted Inmate Simpkins to Booking. I met them halfway and escorted Inmate Simkpins to be stripped and placed in a smock. Inmate Simpkins stated to me that he was suicidal due to being incarcerated and also stated that inmates in Cell D-4 told him to claim to be suicidal to get out of the cell.

> Inmate Simpkins was placed in Cell 157B on high watch for 24 hours.

R. 18-4, PID 206. There are no BCDC records describing the chair incident, and no depositions from BCDC staff. In Simpkins's response to BCDC's summary judgment motion, Simpkins provided a document entitled "Jail Policies," issued on Kentucky Association of Counties letterhead, which describes its "purpose" as "[t]o establish specific guideline[s] for the use of

restraining devices by staff." R. 18-7, PID 234. These policies were presumably in force during Simpkins's incident at BCDC.[3] The policies note the following:

- Restraints are never used "[a]s punishment," "in a way which causes undue physical pain or bodily injury," or "[i]n a manner as to restrict blood circulation or breathing," though they may be applied to "[p]revent self-injurious behavior or injury to others," to "[p]revent or quell a disturbance or riot," or to "[p]rovide appropriate security";

- Restraints are to be "applied as humanely as possible" and should "be reduced to the least restrictive level required as soon as the prisoner is cooperative." Additionally, "[s]taff will attempt to assist the prisoner in gaining control by less restrictive interventions prior to considering application of restraints";

- "Jail staff in accordance with institutional procedures will complete a report, which details the use of clinically ordered physical restraints," and all uses of restraint shall be documented to include: the type of restraint used, the type of clothing the prisoner wore, where the prisoner was placed, whether medications were administered, clinical justification for the use of restraints, a list of interventions attempted by staff, the type of restraints ordered, and prisoner behavior during the application of restraints; and

- The restraint chair "will not be used for punishment, harassment, or to intentionally inflict pain on any offender" and may only be used for "[c]ontrol of a disruptive offender," "[p]revention of bodily harm to other persons," "[p]revention of property damage," "[m]edical procedure, as allowed by policy or court order," "[t]ransportation of a disruptive prisoner," or "[p]revention of self-injury." Prison staff must document efforts "for less restrictive treatment alternatives" "as soon as possible" and may not use the emergency restraint chair for "longer than 2 hours at any one time."

*Id.* at 234–38.

Simpkins was released from BCDC at approximately 11:05 p.m. on September 13, 2018, having been detained for a little over 19 hours, and was charged with one count of "harassing

---

[3] Although the Jail Policies document does not specifically note that it is applicable to Boyd County, Simpkins referred to it in his summary judgment response as "a copy of [BCDC]'s policy regarding restraint chair use," and Boyd County did not dispute its authenticity or otherwise address it. Drawing all reasonable factual inferences in Simpkins's favor, *see Brent v. Wayne Cnty. Dep't of Human Servs.*, 901 F.3d 656, 681 (6th Cir. 2018), we consider this document to be an accurate reflection of BCDC policy at the time of Simpkins's incident.

communications," one count of "speeding, 5 MPH over limit," and one count of "failure to produce insurance card." R. 18, PID 169.

**B.**

Simpkins filed this § 1983 and state-law negligence action in the Boyd Circuit Court against: the Boyd County Fiscal Court (Fiscal Court); Boyd County employees Jimmy Joe Burchett and Unknown Defendants (individually and in their official capacities); and Boyd County employees Carol Tolliver, John Greer, Thomas Jackson, Stephen Towler, and Bill Hensley (in their official capacities). The Fiscal Court is the entity responsible for ensuring that BCDC complies with statutory safety standards. Ky. Rev. Stat. § 441.025.

Simpkins alleged violations of his Eighth, Tenth, and Fourteenth Amendment rights based on the deprivation of his medications and the excessive force to which he was subjected at BCDC. He further asserted that the treatment to which he was subjected "was not unusual, but part of a continuing policy, pattern, custom, and/or practice of the Defendants of willfully and deliberately physically and mentally abusing the inmates." R. 1-1, PID 9. He also asserted a state-law claim for negligence not at issue in this appeal.

Boyd County removed this case to federal court and, at the conclusion of discovery, moved for summary judgment. Simpkins filed a response. The parties supported their positions with the following documents: Simpkins's deposition; Simpkins's traffic citations, arrest records, and BCDC admission and release report; Simpkins's September 13, 2018 emergency-room report; Simpkins's discovery request; a copy of BCDC's jail policies; and a February 28, 2019 document entitled "Investigation of the Boyd County Detention Center (Catlettsburg, Kentucky)" prepared by the U.S. Department of Justice (Civil Rights Division) (hereinafter "DOJ Report" or "Report").

The district court granted Boyd County's motion for summary judgment, concluding in relevant part that (1) the Fiscal Court had to be dismissed because it is not an entity that can be sued; (2) the DOJ Report is irrelevant and inadmissible as evidence of Boyd County's § 1983 liability to Simpkins; and (3) without the DOJ Report, Simpkins provided no evidence that "Boyd County was the moving force behind the excessive force allegedly used against him."[4]  R. 20, PID 248–50.

Simpkins challenges all three rulings.

## II.

This court reviews a district court's grant of summary judgment de novo and "make[s] all reasonable inferences in [the non-movant's] favor." *Brent*, 901 F.3d at 681.  Summary judgment is appropriate if a movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.

## A.

Simpkins argues that the district court erroneously granted summary judgment to the Fiscal Court after concluding that it is "*non sui juris*," meaning that the Fiscal Court is an entity lacking the social and/or civil status necessary for suit.[5]  Simpkins contends that Kentucky fiscal courts

---

[4] Though the district court denied Simpkins's § 1983 claims in their entirety, the court's opinion discussed only Simpkins's excessive-force claim and did not separately address Simpkins's claim of being unconstitutionally deprived of his medication.  Simpkins did not challenge that omission before the district court and does not do so on appeal; his arguments on appeal discuss only the excessive-force claim. Accordingly, he has waived the claim that he was unconstitutionally deprived of his medication.  *Dimond Rigging Co., LLC v. BDP Int'l, Inc.*, 914 F.3d 435, 449 (6th Cir. 2019).

[5] As defined in Black's Law Dictionary, *sui juris* means:

[Latin "of one's own right; independent"] (17c)
1. Of full age and capacity.

are *sui juris* because "claims against a county fiscal court amount to claims against the county itself." Reply at 2.

However, Simpkins successfully sued Boyd County when he sued Tolliver, Greer, Jackson, Towler, and Hensley in their official capacities. Simpkins has brought the proper party before the court, without regard to whether the Fiscal Court nominally remains in the lawsuit. *Coley v. Lucas County*, 799 F.3d 530, 542 (6th Cir. 2015) ("Claims brought against [a county official] in his official capacity are the equivalent of claims brought against a county as a government entity."). Accordingly, we need not address the issue further. *See Goodwin v. Summit County*, 703 F. App'x 379, 382–83 (6th Cir. 2017) (concluding that the district court properly dismissed county officials sued as § 1983 defendants in their official capacities because claims against the officials were duplicative of claims against the county).

**B.**

Simpkins next argues that the district court abused its discretion when it excluded as "inadmissible [and] irrelevant" a DOJ Report summarizing a DOJ investigation of BCDC's practices. Appellant's Br. at 15. We first summarize the Report and then address relevance and admissibility.

**1.**

The DOJ Report, issued on February 28, 2019, was prepared by the DOJ Civil Rights Division after an investigation "into the conditions of confinement at the Boyd County Detention Center ('the Jail')" concluded that there was reasonable cause to believe that conditions at BCDC

---

2. Possessing full social and civil rights.

3. *Roman law.* Of, relating to, or involving anyone of any age, male or female, not in the *postestas* of another, and therefore capable of owning property and enjoying private law rights. SUI JURIS, Black's Law Dictionary (11th ed. 2019).

violated prisoners' constitutional rights "and that these violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights." R. 18-6, PID 218. In relevant part, the investigation concluded that DOJ had "reasonable cause to believe that Boyd County routinely subjects prisoners to excessive force through the use of chemical agents, electronic control devices, and restraint chairs . . . [and] routinely violates prisoners' rights to bodily privacy through its use of restraint chairs." *Id.* According to the Report, the DOJ notified Boyd County officials on November 1, 2016 of its intent to investigate BCDC to determine whether the prison "adequately protects its prisoners from harm due to excessive force," "violates prisoners' rights to bodily privacy," and "places prisoners in restrictive housing without due process of law." *Id.* at 222. The Special Litigation Section of the DOJ Civil Rights Division conducted an onsite inspection of BCDC from November 14 to 17, 2016. During the inspection, DOJ officials

> observed facility processes, interviewed current and former staff and prisoners, met with county officials, and reviewed facility records. Before, during, and after [DOJ's] onsite inspection, [DOJ representatives] reviewed an array of documents, including policies and procedures, organizational charts, incident reports [from March 2016 to November 2016], prisoner grievances, medical and mental health records, and other materials. After [DOJ's] visit, [DOJ officials] also conducted additional interviews with former prisoners and correctional officers.

*Id.* at 222–23, 225. The DOJ Report stated that the DOJ conveyed its "preliminary assessment" of these findings "to Jail and county officials" at the "close" of onsite inspection in 2016. *See id.* at 223. In relevant part, the DOJ provided "notice of the following alleged conditions" at BCDC:

- "Correctional officers routinely use excessive force when they . . . place prisoners in the restraint chair"; and

- "Boyd County violates the constitutional rights of bodily privacy of prisoners by restraining nearly naked prisoners in full view of both prisoners and staff of the opposite gender. Prisoners identified as a suicide risk and non-suicidal prisoners being punished, are stripped of their clothing and placed in suicide

> smocks with no undergarments, and strapped with their legs apart to the restraint chair in an open hallway, their genitals exposed to passers-by."

*Id.* at 222.

The DOJ Report concluded that there is "reasonable cause to believe that the Jail violates the Eighth Amendment rights of state prisoners and sentenced county prisoners and the Fourteenth Amendment rights of pretrial detainees by routinely subjecting these prisoners to . . . the use of a restraint chair as corporal punishment without any penological justification" and that the DOJ "identified multiple incidents of excessive force, coupled with deliberate indifference to the use of excessive force on the part of Jail officials and staff." *Id.* at 225. More specifically, the Report concluded that "Jail officials use the restraint chair as the first means of dealing with a prisoner when less intrusive means are available," BCDC has a "practice of using a restraint chair in a manner that exposes [prisoners'] bare genitals to the opposite sex," and this "punitive and humiliating method of restraint chair use is sanctioned at the highest level." *Id.* at 228, 230–31. The Report also concluded that these incidents of force were underrepresented in BCDC's reports because "Jail staff are not trained on the continuum of force policy and do not follow the policy in practice," "[t]he Jail does not train, prepare, or even expect staff to interact with prisoners through non-forceful or non-combative modalities, such as effective verbal communication," "Jail policy does not require correctional officers to report every use of force," "written reports are not regularly generated," reports that describe uses of force often "do not contain adequate information," and "staff do not face consequences for using excessive force." *Id.* at 225, 229–30. These findings led the DOJ to conclude that "Jail officials are deliberately indifferent to a pattern or practice of improper use of force by Jail staff" and "[t]he pattern or practice of excessive force at the Jail is attributable, in part, to its inadequate training on its policies." *Id.* at 226, 229. The

Report supported these conclusions by describing a number of examples of the unlawful use of restraint chairs and/or failure to document and train against excessive uses of force, including:

- "[F]ive correctional officers were indicted for first degree manslaughter of a prisoner found dead in a restraint chair on November 29, 2018 from blunt force trauma to his side which fractured three ribs and caused internal bleeding, resulting in death";

- "[I]n the 'Force Used' section of one incident report, the officer wrote 'None.' However, in his narrative of the report, he wrote that an officer fired 'four rounds of OC pepper ball' and that another officer shot the pepperball gun into the floor. This and other uses of force were not captured in the Jail's data";

- "[While] Jail officials are fully aware or should be aware of staff failures to follow the Jail's continuum of force policy and properly employ appropriate de-escalation techniques to prevent excessive force, . . . [e]ither the Jail has intentionally ignored the multiple instances we found of excessive force contained in its own incident reports, or has failed adequately to review, monitor, track, supervise, and/or investigate the documented excessive use of chemical agents and electronic control devices per its own policy[, which] . . . is borne out in the Jail's lack of any disciplinary report or action against staff in the last six years";

- "Jail officials have placed prisoners in the restraint chair due to a prisoner's non-physical resistance without trying any less restrictive means. For example, one correctional officer placed a prisoner in a restraint chair because the prisoner complained about being denied a phone call to his family after a family member had died. In another situation, a correctional officer responded to a situation involving two prisoners who had been fighting. When the correctional officer arrived on the scene and opened the door, the prisoners stopped fighting. Nevertheless, the officer handcuffed both prisoners and then placed them in restraint chairs";

- "When a staff member does report a use of force, the reports do not contain adequate information, including an accurate account of the events leading up to the use of force, an account of the actual event written in specific terms in order to capture the details of the event, the type of force used and its justification, potential witnesses, including prisoner witnesses, and the nature and extent of any injuries and whether medical care was provided. . . . [Nor does BCDC] review and investigate its uses of force . . . [or] track its uses of force to identify trends in the use of force or officers who overuse force. As a result, staff do not face consequences for using excessive force. [The DOJ] uncovered no documentation of discipline of a correctional officer for improper use of force";

- "Prior to placing prisoners in the restraint chair, prisoners are instructed to change out of their uniforms and put on loose fitting 'suicide smocks,' and are then secured to the chair. The Jail uses restraint chairs both to protect suicidal

prisoners and to punish non-suicidal prisoners. . . . A prisoner is strapped to a restraint chair by his or her ankles, waist, chest, and arms. . . . Any prisoner placed in the hallway restraint chair is in clear view of any staff or prisoners walking down the hall. When prisoners are wearing loose-fitting smocks with no undergarments, their genitals are often in clear view of staff and other prisoners as well";

- "In one instance, in 2015, the Jailer placed both restraint chairs in the hallway and then ordered two women prisoners wearing suicide smocks to be strapped to the chairs. The straps secured the women's waists and chests to the chair, their arms behind their backs, and their legs to opposite sides of their chairs. The combination of the leg straps and waist strap prevented the women from being able to move their knees together to shield their genitals from exposure. The Jailer then instructed correctional officers to transport male prisoners from their housing unit, past the restrained and exposed women, and into the recreation courtyard. In another incident, also in 2015, the Jailer ordered a woman who had a panic attack to be restrained in the restraint chair with her legs spread, clothed in nothing but a suicide smock, and placed on public display in the hallway. A former correctional officer photographed the Jail security camera display showing the woman in the restraint chair"; and

- "Prisoners who express suicidal ideation fare no better in the restraint chair. Instead of putting these individuals in an environment where they can be safe, the Jail actually increases the danger to prisoners at risk of suicide by exposing them to public humiliation and ridicule. While preventing suicide may in some circumstances justify a minor intrusion of a prisoner's right to privacy, the Jail's pattern of exposing a suicidal prisoner's genitals to individuals of the opposite sex violates prisoners' Fourth Amendment rights."

*Id.* at 223–33.

Finally, the Summary page of the DOJ Report notes:

This Notice provides the Department of Justice's assessment of the facts and the law in its capacity as a law enforcement agency authorized to conduct an investigation and file a lawsuit. The Department does not serve as a tribunal authorized to make factual findings and legal conclusions, and nothing in this Notice should be construed as a factual finding or legal conclusion. Accordingly, this Notice is not intended to be admissible evidence and does not create any legal rights or obligations.

*Id.* at 222.

**2.**

The district court excluded the DOJ Report stating:

The burden is upon [Simpkins to provide evidence for his § 1983 claim], yet the only so-called proof he offers is a report issued by the Department of Justice in February 2019 which is not only inadmissible but also irrelevant. The report is based on information in the Department of Justice's review of incident reports from BCDC dated between March 2016 and November 2016 and its site visit which occurred in November 2016. The period covered by the report predates Plaintiff's stay in the BCDC by almost 2 years. Therefore, any conclusions in the Report are likely not reflective of conditions at the BCDC in September 2018 and, without any additional or corroborating evidence, are irrelevant to Plaintiff's claims.

Further, the report, by its own terms, cannot be used as evidence in Plaintiff's lawsuit. It specifically provides: "The Department [of Justice] does not serve as a tribunal authorized to make factual findings and legal conclusions, and nothing in this Notice should be construed as a factual finding or legal conclusion. Accordingly, this Notice is not intended to be admissible evidence and does not create legal rights or obligations."

R. 20, PID 249–50 (docket citations omitted).

We "reverse a district court's decision to admit or exclude evidence only if we find that the district court has abused its discretion." *Barner v. Pilkington North America, Inc.*, 399 F.3d 745, 748 (6th Cir. 2005) (quoting *Beck v. Haik*, 377 F.3d 624, 636 (6th Cir. 2004)). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, [] improperly applies the law, or [] employs an erroneous legal standard." *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004).

The district court excluded the Report for two reasons: irrelevance and the Report's own disclaimer that it was "not intended to be admissible evidence." R. 20, PID 249–50. The district court did not discuss any formal rules of evidentiary admissibility or inadmissibility other than its reference to relevance.

**a.**

As to admissibility, the district court summarily concluded that the DOJ Report's own internal disclaimer rendered it inadmissible. Simpkins argues that the DOJ Report is a trustworthy "public record" that is admissible, even with the disclaimer, as non-hearsay pursuant to Federal Rule of Evidence 803(8).

The district court abused its discretion to the extent it concluded that the DOJ Report "by its own terms[] cannot be used as evidence" merely because the Report stated it was "not *intended* to be admissible evidence." R. 20, PID 249–50 (emphasis added). Disclaiming language does not, by itself, impact a federal court's admissibility analysis. "The court must decide any preliminary question about whether . . . evidence is admissible." Fed. R. Evid. 104(a); *see also Mazuma Holdings Corp. v. Bethke et al*, 1 F. Supp. 3d 6, 17 (E.D.N.Y. 2014) (refusing to exclude from evidence a Securities and Exchange Commission (SEC) self-disclaiming cease-and-desist order because "the fact that an agency or the parties before it provide by rule or stipulation that the factual findings are not binding and disclaim their validity in other proceedings does not control their admissibility in federal civil proceedings, wherein the admissibility of evidence is governed by the Federal Rules of Evidence") (quoting *S.E.C. v. Pentagon Cap. Mgmt. PLC*, No. 08 civ. 3324, 2010 WL 985205, at *3 (S.D.N.Y. Mar. 17, 2010) (holding the same and admitting several SEC Commission Order findings under Rule 803(8))); *Option Res. Grp. v. Chambers Dev. Co., Inc.*, 967 F. Supp. 846, 848, 851 (W.D. Pa. 1996) (holding the same and admitting several self-disclaiming SEC settlement-offer documents under Rule 803(8)); *E.E.O.C. v. Wal-Mart Stores, Inc.*, Civil No. 07-0300 JPA/LFG, 2009 WL 3028981, at *5 (D.N.M., Sep. 8, 2009) (refusing to exclude from evidence private corporate position statements merely because the

statements' author "included a footnote specifically stating that the position statements were not intended to be admissible evidence").

The DOJ Report's disclaimer about admissibility included no explanation of *why* the Report was inadmissible under relevant evidentiary standards, and the district court did not provide additional reasoning. The court abused its discretion in concluding that the disclaimer alone rendered the Report inadmissible.

**b.**

As to relevance, the district court concluded that conditions described in the Report were "likely not reflective of conditions at the BCDC in September 2018" because the Report "predates [Simpkins]'s stay in the BCDC by almost 2 years." *Id.* But this conclusion reflects an incomplete reading of the Report. Although DOJ officials conducted an onsite BCDC inspection and document review in November 2016—and although the Report devotes the majority of its analysis to events in 2015 and 2016—the second page of the Report describes a related incident in November 2018 resulting in "five correctional officers [being] indicted for first degree manslaughter of a prisoner found dead in a restraint chair" due to "blunt force trauma to his side which fractured three ribs and caused internal bleeding, resulting in death." R. 18-6, PID 222–23. This incident took place two months after Simpkins's own experience in a restraint chair. All told, the Report describes at least five discrete chair-related incidents spanning 2015 through 2018, in addition to more general observations about BCDC's recordkeeping, supervision of officers, and other allegedly deficient protocols regarding use of restraint chairs, and other instances of excessive force.

Evidence is "relevant" when it has "*any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

without the evidence." *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006) (quoting Fed. R. Evid. 401). In a § 1983 case, evidence of multiple discrete incidents of alleged federal rights violations is relevant for determining whether a municipality has a "custom" of violating those rights. *Pineda v. Hamilton County*, 977 F.3d 483, 495 (6th Cir. 2020) ("A series of investigative failures . . . might at least suggest that the local entity's custom led to the [§ 1983 plaintiff's] harmful action.") (finding no evidence of a municipal custom when the plaintiff "challenges only a single failure to investigate his own excessive-force claim and has made no attempt to show several separate instances of the alleged rights violation") (internal citation omitted); *see also Alkire v. Irving*, 330 F.3d 802, 818 (6th Cir. 2003) (concluding that nine other cases of similar alleged constitutional violations was sufficient to find a "custom" of those violations); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1243, 1247 (6th Cir. 1989) (concluding that it was not an abuse of discretion to find evidence of an illegal custom, policy or practice when "there was evidence that other paraplegic or physically infirm inmates at the Shelby County Jail had been similarly mistreated and that . . . there had been enough similar incidents [at least 14] to put the Sheriff, in his official capacity, on notice that [the plaintiff] would be subject to constitutional deprivation"). Many of the alleged chair-related and other rights violations described in the DOJ Report from 2015 through 2018 are similar to the rights violations alleged by Simpkins.

In excluding the DOJ Report on relevance grounds, the district court ignored the most recent incident described in the Report, which took place two months after Simpkins's own stay in BCDC and directly contradicts the court's conclusion that conditions described in the Report were "likely not reflective of conditions at the BCDC in September 2018." R. 20, PID 249–50.

Nor did the district court discuss the fact that Simpkins's description of his experience in the restraint chair is precisely in line with the abuses described in the Report.

The district court abused its discretion by excluding the DOJ Report on relevance grounds.[6] *Barner*, 399 F.3d at 748.

**c.**

The next question, which went unaddressed by the district court, is whether the report is inadmissible for other reasons. While "[t]he submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial," they must "lay[] out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). On appeal, Simpkins contends that the DOJ Report is admissible as a non-hearsay "public record" under Federal Rule of Evidence 803(8). Rule 803(8) states that a "record or statement of a public office" is admissible as non-hearsay if:

(A) [I]t sets out:

    (i)     the office's activities;

    (ii)    a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or

    (iii)   in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

(B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

---

[6] The district court additionally noted that "without any additional or corroborating evidence, [the incidents described in the DOJ Report are] irrelevant to Plaintiff's claims." R. 20, PID 249–50. Setting aside the fact that Simpkins's own testimony is corroborating evidence that the alleged BCDC policy or custom of excessive force still existed in 2018, this conclusion was improper. "Even if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence [on relevance grounds] if [the evidence] has the slightest probative worth." *Whittington*, 455 F.3d at 738–39 (internal citation omitted).

The Advisory Committee Notes explain that the "[j]ustification for the exception is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." *Id.* Adv. Comm. Note (8). This rule "allows for admission of reports containing opinions and conclusions, as well as facts . . . as long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement." *Miller v. Field*, 35 F.3d 1088, 1090 (6th Cir. 1994) (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169–70 (1988)). Because courts must apply a "presumption" that reports submitted pursuant to Rule 803(8) are "admissib[le] in the first instance . . . the burden is upon the opponent to show that the report [is] inadmissible because its sources of information or other circumstances indicated a lack of trustworthiness." *Id.* (quoting Adv. Comm. Notes to Fed. R. Evid. 803(8)) (other internal quotations omitted).

Neither party disputes that the Report satisfies Rule 803(8)(A): it sets out (i) the office's activities under the Civil Rights of Institutionalized Persons Act (CRIPA); (ii) matters observed while under a legal duty to report; and (iii) factual findings from a legally authorized investigation.

Accordingly, the Report is admissible if "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B). To determine whether an 803(8) report is trustworthy, we consider four factors: (1) the timeliness of the investigation upon which the report is based; (2) the special skill or experience of the investigators; (3) whether the agency held a hearing; and (4) possible motivational problems. *Alexander*, 576 F.3d at 563. "This list of factors is not exclusive; any circumstance which may affect the trustworthiness of the underlying information, and thus, the trustworthiness of the findings, must be considered when ruling upon the admissibility of factual findings under this rule." *Id.* (quoting *In re Complaint of Paduca Towing Co., Inc.*, 692 F.2d 412, 420 (6th Cir. 1982)).

Neither the district court, nor Boyd County in its summary judgment briefing before the district court, explained why—apart from the disclaimer—the Report lacks the requisite indicia of trustworthiness. The closest they came to doing so was noting that the bulk of the Report focused on incidents from 2016—two years before Simpkins's stay at the jail. Though Boyd County explicitly mentions the 803(8)(B) trustworthiness factors on appeal, it does not discuss them in detail and notes only that "[w]ith how quickly personnel, policies, training[,] and operations of a government facility can change over the course of two plus years, [the Report has] no inherent trustworthiness." Appellee's Br. at 12.

But, the fact that the DOJ's investigation began in 2016 does not undermine the Report's trustworthiness. The Report describes events from 2017–18 in addition to events from 2015–16. Because the DOJ uncovered evidence of similar restraint-chair-related abuse incidents in 2015, 2016, and 2018, there is no reason to believe that the Report's trustworthiness is undermined by any "change over the course of [those] two plus years."

Nor is the report "untimely" within the meaning of Rule 803(8)(B), which is concerned with the staleness of evidence. *See Chavez v. Carranza*, 559 F.3d 486, 496 (6th Cir. 2009) ("[T]he timeliness factor focuses on how much time passed between the events being investigated and the beginning of the investigation"). As previously discussed, DOJ investigators analyzed incidents from 2015–16 while onsite in 2016, and then, in 2019, they analyzed additional incidents that occurred in 2017 and 2018. R. 18, PID 177 ("Since our site visit, conditions and security at the Jail have deteriorated further."). There is nothing in the Report or record to suggest that the DOJ was untimely in reviewing records and witnesses, or that evidence had gone stale in the interim.

As to the remaining 803(8)(B) factors, Boyd County's summary judgment briefing before the district court failed to raise any other objections to the Report's trustworthiness or otherwise

carry its burden "to show that the report was inadmissible because its sources of information or other circumstances indicated a lack of trustworthiness." *Miller*, 35 F.3d at 1090 (quoting Adv. Comm. Notes to Fed. R. Evid. 803(8)) (other internal quotations omitted). Nor has Boyd County made any other 803(8)(B) trustworthiness arguments on appeal. Were we to nevertheless address the remaining 803(8)(B) factors, the Report likely satisfies their admissibility requirements: the DOJ's Special Litigation Section authored the report pursuant to its "special skill" as a department endowed with statutory investigative authority; there is nothing in the record to suggest that the DOJ suffered from "motivational problems"; and though the lack of a formal hearing weighs against trustworthiness, we have noted that "a formal hearing is not necessary when other indicia of trustworthiness are present," as is the case here.[7] *Chavez*, 559 F.3d at 498.

Additionally, we have held in numerous other cases that such investigative reports are admissible under Rule 803(8). *See, e.g.*, *Griffin v. Condon*, 744 F. App'x 925, 930 (6th Cir. 2018) (affirming the district court's decision to admit an Ombudsman's Office investigative report of prison guards over hearsay and relevance objections); *Jones v. Sandusky County*, 652 F. App'x 348, 356 (6th Cir. 2016) (noting that a district court's "[w]holesale exclusion" of an investigative police report on hearsay grounds was error because the report fell squarely within Rule 803(8)'s exception to the hearsay rule, "even those portions of the report consisting of conclusions or

---

[7] Despite the DOJ's disclaimer that it is not a "tribunal" and that its Report should not be "construed as a factual finding or legal conclusion," the Report goes on to lay out significant factual findings and conclusions derived from information collected pursuant to statutory authority, as well the methodologies by which it reached them. *See id.* at 176–77 ("This Notice provides the Department of Justice's assessment of the facts and the law in its capacity as a law enforcement agency authorized to conduct an investigation and file a lawsuit. . . . During our onsite inspection, we observed facility processes, interviewed current and former staff and prisoners, met with county officials, and reviewed facility records. Before, during, and after our onsite inspection, we reviewed an array of documents, including policies and procedures, organizational charts, incident reports, prisoner grievances, medical and mental health records, and other materials. After our visit, we also conducted additional interviews with former prisoners and correctional officers.").

opinions formed as a result of a factual investigation"); *Roland v. Johnson*, 933 F.2d 1009 (Table), at *2 (6th Cir. 1991) (concluding that the district court did not abuse its discretion in a § 1983 case by admitting into evidence two investigative reports, one federal and one state, investigating violence at the pertinent prison, when the court "found the police and Justice Department reports would be helpful to the jury in determining whether the defendants acted with deliberate indifference" and when "[e]ach [report] was admissible under Fed. R. Evid. 803(8)(C) as a public report 'made pursuant to authority granted by law'").

Finally, there are other reasons why the Report, or portions of the Report, might be admissible. For example, portions of the Report might be admissible to show that BCDC was on notice of alleged constitutional violations at least as early as 2016. *See, e.g.,* R. 18, PID 176 ("The Department of Justice (DOJ) provides notice, pursuant to 42 U.S.C. § 1997b, that there is reasonable cause to believe that conditions at the Boyd County Detention Center violate the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution and that these violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights protected by the Fourth, Eighth, and Fourteenth Amendments."). And portions of the Report discussing recordkeeping policies could also plausibly be offered to explain why BCDC may lack records describing Simpkins's incidents.

In short, the district court abused its discretion by excluding the DOJ Report in its entirety. On remand, the court should not exclude the DOJ Report without a more thorough analysis to determine whether and why certain portions of the Report are admissible or inadmissible.

**3.**

Finally, we turn to whether the district court's grant of summary judgment to Boyd County on Simpkins's § 1983 claim was proper even considering the Report.

Section 1983 provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. In order to establish liability under § 1983, Simpkins must show that (1) he was deprived of a right secured by the United States Constitution or the laws of the United States; and (2) he was subjected or caused to be subjected to the constitutional deprivation by a person acting under color of state law. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994) (citing *Flagg Bros. v. Brooks*, 436 U.S. 149, 155 (1978)). As to the second prong, "counties are considered 'persons' within the meaning of 42 U.S.C. § 1983." *Alkire*, 330 F.3d at 814. A county or other municipal entity may be held liable for constitutional deprivations under the *Monell* theory of liability—that is, when the deprivation was caused by "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 815 (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). To demonstrate *Monell* liability, Simpkins must (1) identify the policy or custom that injured him; (2) connect the policy to Boyd County; and (3) show that his particular injury was incurred due to execution of that policy or custom. *Id.*

There are four methods of proving an unlawful policy or custom: (1) showing an illegal official policy or legislative enactment; (2) demonstrating that an official with final decision-making authority ratified illegal actions; (3) showing a policy of inadequate training or supervision; or (4) demonstrating a custom of tolerance of or acquiescence to federal rights violations. *Wright v. City of Euclid*, 962 F.3d 852, 880 (6th Cir. 2020). In this case, Simpkins

argues that BCDC maintained both a policy of inadequate training or supervision and a custom of tolerance of or acquiescence to federal rights violations.

The district court began and ended with the second prong of the § 1983 analysis: whether BCDC and its agents could be held liable for a constitutional deprivation under the *Monell* theory of liability. The court concluded that Simpkins had neither produced sufficient evidence of a BCDC policy or custom nor demonstrated that his injuries were due to execution of such a policy or custom. The only evidence of a custom that Simpkins provided to the district court—in addition to his own testimony about his experience with BCDC and a copy of BCDC's restraint-chair policies—was the February 2019 DOJ Report.

> After excluding the Report on its face, the court concluded:
>
> Plaintiff has developed no evidence that any policy, procedure or custom of Boyd County was the moving force behind the excessive force allegedly used against him by persons who are not parties to this case. Plaintiff did not propound any written discovery, did not take a single deposition, did not issue any subpoenas, and did not retain any expert witness to support the theory that his 2018 injuries were caused by the 2016 incidents discussed in the DOJ Report. He simply filed suit and expected the DOJ report to do the rest. As Defendants note "that dog will not hunt."

*Id.* at 250. The district court did not analyze whether the Report's contents, plus Simpkins's own testimony, would be sufficient to create a question of material fact for the jury. On appeal, Simpkins asserts that this evidence together suggests "an established pattern or practice of violations" at BCDC "consistent with the treatment Mr. Simpkins testified he received." Appellant's Br. at 18–19. The government responds that "even if the Report were admissible, Simpkins fails to establish that . . . it was a BCDC policy, custom, or practice that led to his injury." Appellee's Br. at 12.

On the one hand, and to the district court's point, there is no dispute that Simpkins provided little by way of discovery and did little to connect his own experience to the alleged customs and

policies described in the Report. And, given his failure to depose any BCDC staff or otherwise list BCDC staff members in his Rule 26(a) disclosure, he will not be able to use related information or witnesses to supply evidence at trial, without leave of court. Fed. R. Civ. P. 37(c)(1).

On the other hand, the DOJ Report arguably threads that needle for him, as well as provides evidence significantly probative of the other *Monell* elements. It describes at least five other discrete incidents involving BCDC officers allegedly using excessive force on prisoners in a restraint chair from 2015 through 2018: the incident in which five correctional officers were indicted for manslaughter after a prisoner was found beaten to death in the restraint chair; two incidents in which BCDC officials "placed prisoners in the restraint chair due to a prisoner's non-physical resistance without trying any less restrictive means;" and two incidents in which BCDC officials used the restraint chair to humiliate and expose the genitals of prisoners as a form of punishment. R. 18-6, PID 223, 228, 231. No caselaw within our circuit requires the production of evidence of almost identical conduct, such as an assault involving tightened straps around the inmate's neck as alleged in this case. Although our circuit does not appear to have explained how "similar" past incidents must be to constitute a "pattern of similar constitutional violations" for *Monell* purposes, *see Connick v. Thompson*, 563 U.S. 51, 62 (2011), we need not do so here, because it is at least clear that the incidents are similar enough to constitute a "policy" within the meaning of *Monell,* as all of the incidents described above constitute, in the Report's words, "the use of a restraint chair as corporal punishment without any penological justification," R. 18-6, PID 225, which is the precise mistreatment Simpkins alleges he suffered. *See Alkire*, 330 F.3d at 818 (holding that a plaintiff, who alleged that he had been detained for failure to pay a debt without inquiry into his ability to pay, alleged a "policy of requiring payment of fees and costs . . .

regardless of ability to pay" when he "produced nine other cases of alleged detention . . . for failure to pay a debt").

The Report also supports a finding that BCDC was on notice of the constitutional-rights violations and that officers were not adequately trained at the time of Simpkins's incident. The Report states that the DOJ communicated its preliminary assessment to BCDC in 2016 and that it notified BCDC that "[c]orrectional officers routinely use excessive force when they . . . place prisoners in the restraint chair," and that "[p]risoners identified as a suicide risk and non-suicidal prisoners being punished, are stripped of their clothing and placed in suicide smocks with no undergarments, and strapped with their legs apart to the restraint chair in an open hallway, their genitals exposed to passers-by." R. 18, PID 176–77. Moreover, Simpkins provided two pieces of key evidence that these behaviors persisted in 2018: his own testimony that he was subjected to excessive force through unnecessary use of the restraint chair, and the Report's conclusion in 2019 that, since 2016, "conditions and security at the Jail have deteriorated further," based in large part on a prisoner being found beaten to death in a restraint chair in November 2018. *Id.* at 177.

Finally, the Report provides adequate evidence that deficient training caused Simpkins's injury. As the non-moving party, Simpkins need only "lay[] out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander*, 576 F.3d 558. A jury may use evidence of a pattern of deficient training at the time of an alleged rights violation to infer that the deficient training caused the rights violation. *See Wright*, 962 F.3d at 880 (concluding that a reasonable jury could use the same evidence of deficient police procedure and oversight to conclude both that "excessive-force training regimen and practices gave rise to a culture that encouraged, permitted, or acquiesced to the use of unconstitutional excessive force,"

and that "as a result, such force was used on [the plaintiff]"). At this stage of the proceedings, we cannot say that a reasonable jury could not make that inference in Simpkins's case.

In addition to the DOJ Report, Simpkins also provided his own testimony about the September 2018 chair incident, a copy of BCDC procedures, and a copy of Layne's internal incident report (which omits discussion of the restraint chair). Taken in the light most favorable to Simpkins, all of this evidence together suggests numerous BCDC policy violations that are similar to those described as "customary" in the DOJ Report, including: use of the restraint chair for punishment or harassment; failure to use lesser methods of restraint before escalating to the restraint chair; failure to treat Simpkins humanely while restraining him; and failure to document use of the restraint chair. Together, this evidence could suggest to a jury that (1) there was a policy of inadequate use-of-force training and a custom of tolerating restraint-chair rights violations; (2) perpetuated by BCDC officers and of which BCDC was aware; 3) that was ongoing at the time of Simpkins's detention. *See Alkire*, 330 F.3d at 815. A reasonable jury could find this evidence sufficient to carry Simpkins's *Monell* claim. *See Wright*, 962 F.3d at 880. To this end, the DOJ Report, along with Simpkins's other evidence, could "show that [Simpkins] *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander*, 576 F.3d at 558.

Because the district court has yet to determine which portions of the DOJ Report are admissible, we do not hold here that the DOJ Report creates a genuine issue of material fact; that is a question for the district court on remand. However, it is not clear on this record that, as Boyd County argues, Simpkins fails to establish a material issue of fact even with the Report.

Accordingly, the district court erred in granting summary judgment to Boyd County without considering the Report.

## IV.

For the reasons set out above, we REVERSE the district court's exclusion of the DOJ Report, VACATE the district court's summary judgment determination, and REMAND for further proceedings consistent with this opinion.

**ALICE M. BATCHELDER, Circuit Judge**, concurring in part and dissenting in part.

I agree that Simpkins successfully sued Boyd County. I further agree that the district court abused its discretion by excluding the DOJ Report. Nevertheless, I would hold that no reasonable jury could find for Simpkins on his *Monell* claim and would affirm the district court's grant of summary judgment to Boyd County. Therefore, I respectfully dissent from Part III.B(3).

## I.

Although I agree with the majority that the district court abused its discretion by finding the DOJ Report irrelevant and inadmissible, I would find that the error was harmless. "We will reverse the district court only if we find that the abuse of discretion causes more than harmless error." *Dortch v. Fowler*, 588 F.3d 396, 402 (6th Cir. 2009) (internal quotation omitted). "More than harmless error means that the evidence would have caused a different outcome at trial." *McDole v. City of Saginaw*, 471 F. App'x 464, 471 (6th Cir. 2012) (citing *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 514 (6th Cir. 1998)). For the reasons that follow, I would find that, even including the DOJ Report, Simpkins's claim cannot survive summary judgment.

## II.

In § 1983 actions, a municipality cannot be held liable "*solely* because it employs a tortfeasor." *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 691 (1978). Rather, for liability to attach, a "policy or custom" must cause the constitutional violation. *Id.* at 694. Claims that rely on a policy or custom, also known as *Monell* claims, require "rigorous standards of culpability and causation." *Bd. of Cty. Commr's of Bryan City v. Brown*, 520 U.S. 397, 405 (1997). That is so because in almost every case, "a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate incident." *Connick v. Thompson*, 563 U.S. 51, 67 (2011) (quotation omitted). Consequently, plaintiffs who bring *Monell* claims

face a "high bar" and a "*Monell* claim that survives summary judgment is exceedingly rare." *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 541–42 (6th Cir. 2018).

There are four ways to prove liability through a municipality's policy or custom. *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Simpkins has alleged facts and offered evidence that can plausibly utilize only two of those ways. The first way is through the existence of a custom of inaction that caused Simpkins's injury. *Id.* The second way is through the existence of a policy of inadequate training/supervision that caused Simpkins's injury. *Id.* For either way, no reasonable juror could find for Simpkins.

**A.**

Start with the custom-of-inaction way. Simpkins must present evidence that (1) Boyd County had notice of a clear and persistent pattern of unlawful activity; (2) that Boyd County tacitly approved of the unlawful activity by doing nothing; and (3) that Boyd County's tacit approval caused Simpkins's injury. *Howse v. Hodus*, 953 F.3d 402, 411 (6th Cir. 2020). Simpkins tries to establish all three elements on two main pieces of evidence: his own deposition testimony and the DOJ Report. But these cannot, even when combined, establish that Boyd County practiced a custom-of-inaction that led to the constitutional injury that Simpkins suffered.

On the first element, Simpkins relies on the DOJ Report's giving notice to Boyd County. But the notice given must be of a clear and persistent pattern of unlawful activity. And the DOJ Report, on its own, cannot establish a clear and persistent pattern of unlawful activity. For one, Simpkins has not offered, whether in the DOJ Report or in his deposition testimony, data on how many excessive force incidents would be normal for the jail. And without such data, Simpkins lacks the proper context to show a persistent pattern of excessive use of force at the jail. *See*

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429–31 (6th Cir. 2005); *Siler v. Webber*, 443 F. App'x 50, 54 (6th Cir. 2011).

For another, the deficiencies described in the DOJ Report are not on all-fours with the deficiencies described by Simpkins. The DOJ Report discussed at length the officers' improper use of force by way of tasers and pepper spray, yet neither of those was used on Simpkins. The report also discussed the improper use of restraint chairs in open areas of the jail that allegedly violated the inmates' right to privacy found in the Fourth Amendment. But even that type of deficiency does not appear to correspond with what Simpkins alleges. As he tells it, the officers fastened him to a restraint chair in a closed jail cell, not an open hallway as was described in the DOJ Report.

Granted, the DOJ Report does provide some relevant evidence in that it documented incidents involving excessive use of force. But some relevant evidence is not sufficient to get Simpkins over the high bar of a *Monell* claim. Indeed, the relevant evidence that the DOJ Report does offer is limited because the similarities dissipate when we compare the specifics of the DOJ Report to the specifics of Simpkins's claim. The DOJ Report did not document any incidents that involved what Simpkins alleges: a gratuitous physical assault on an inmate and tightened straps around his neck in the restraint chair. *See Hicks-Field v. Harris County*, 860 F.3d 803, 810 (5th Cir. 2017) (finding a DOJ Report relevant, but not sufficient to show a widespread practice of misconduct because there was not "sufficient similarity" between the constitutional violations in the report and the constitutional violations alleged by the plaintiffs); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 238 (7th Cir. 2021) (finding that the reports did not provide notice of the type of unlawful activity alleged by the plaintiffs). While relevant, Simpkins cannot rely solely

on the DOJ Report to establish notice of the clear and persistent pattern of excessive force that Simpkins alleges.

Turn to the second element. Even if the jail had notice of a persistent pattern, Simpkins did not present evidence that Boyd County approved of the persistent pattern by doing nothing.

First, the law on the second element. Faced with notice that its employees will probably violate constitutional rights, a municipality may not adopt a custom of inaction. *See Farmer v. Brennan*, 511 U.S. 825, 841 (1994). However, liability does not attach to a municipality simply because one of its employees happened to do something unconstitutional, "for liability would then rest on *respondeat superior*." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). For that reason, a municipality's custom of inaction must "reflect some degree of fault." *Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005) (quotation omitted). Consequently, "blanket assertions" that the municipality tolerated or acquiesced to the misconduct "aren't enough." *Howse*, 953 F.3d at 411. Rather, the plaintiff must submit some type of evidence showing that the municipality "made a conscious decision not to act." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 966 (7th Cir. 2019); *accord Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996) (to win on a custom-of-inaction claim, the plaintiff must submit "evidence showing an obvious, deliberate indifference" to the misconduct).

On the second element, Simpkins's claim faces two roadblocks. First, Simpkins relies on the DOJ Report to establish Boyd County's tacit approval by doing nothing, but that report will not suffice. Consider the timing of the investigation that led to the DOJ Report's findings. The report found that the officers often used excessive force without justification, and the jail failed to investigate those incidents. But those findings were based on an investigation and review of records from 2016, almost two years prior to Simpkins's stay. While it is possible that the jail

acquiesced through inaction for the two years following the investigation, Simpkins does not offer evidence, whether by deposition, affidavit, or otherwise, that establishes the jail's inaction for those two years.

Second, a handful of discrete incidents closer in time is not enough to prove tacit approval through inaction. Simpkins points us to four incidents from 2017 and 2018 that the DOJ appended to the DOJ Report, as well as his own incident. But these incidents cannot establish a genuine issue as to whether—despite having notice—the jail consciously chose not to act. For starters, only one of the four incidents appended to the DOJ Report is relevant to Simpkins. The other three incidents involved inmate deaths from drug overdoses, and a prison riot in 2017. Simpkins's *Monell* claim did not arise from a drug overdose or a prison riot, it arose from an alleged physical assault in the jail hallway and the improper way officers tied Simpkins to the restraint chair.

The remaining incident from the DOJ Report occurred in November 2018 and involved an inmate death from blunt force trauma to his side while tied to a restraint chair. Five jailers were indicted for manslaughter in the wake of the prisoner's death the next month. Although Simpkins's own incident and the November 2018 incident are relevant, two discrete incidents cannot show the jail's tacit approval through inaction. *See Thomas*, 398 F.3d at 433; *Jones v. Muskegon Cty.*, 625 F.3d 935, 946 (6th Cir. 2010) (holding that a jury cannot reasonably infer from five incidents approval of a widespread custom of ignoring patient requests). Indeed, If Simpkins had offered some evidence, any evidence, that in the two years since 2016, the jail chose not to correct the deficiencies found by the DOJ Report, his claim might have some merit. This he failed to offer. And to win on a custom-of-inaction claim, he cannot solely rely on two incidents, no matter how

serious. Otherwise, municipal liability would collapse into *respondeat superior* liability, which the Supreme Court prohibited in *Monell* itself, 436 U.S. at 691.

**B.**

Turn to the failure-to-train way. "In order to show that a municipality is liable for a failure to train its employees, a plaintiff must establish that: 1) the [county's] training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the [county's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019). For similar reasons why Simpkins's custom-of-inaction claim fails, his failure-to-train claim fails too.

For the first element, the DOJ Report is not sufficient to show that the jail's training and supervision program was inadequate. Again, the timing of the DOJ's investigation is fatal to Simpkins's claim. Although the DOJ Report found that the jail did not offer adequate training and supervision on proper use of force, the investigation that led to this finding occurred in 2016, almost two years prior to Simpkins's stay. Absent from the report is any indication that the jail lacked adequate training near or at the time that Simpkins arrived. A reasonable jury cannot infer an inadequate training/supervision program when the most recent evidence is from two years earlier. *See, e.g., Yatsko v. Grazioli*, 458 F. Supp. 3d 702, 717 (S.D. Ohio 2020) (finding incidents several years prior to the relevant time period insufficient to establish a *Monell* claim); *Dean*, 18 F.4th at 239 (finding that a report that documented an inadequate policy from 2014 did not reflect the policies at the relevant time period two years later).

And the incidents that occurred closer in time cannot get Simpkins over this hurdle. To be sure, a plaintiff can establish a failure-to-train claim on one or two incidents if the need for the training is "so obvious," and the constitutional violation is "so likely." *Harris*, 489 U.S. at 390.

And here, two incidents could plausibly qualify: Simpkins's own incident and the tragic death of an inmate who suffered blunt force trauma from officers while strapped to a restraint chair. Nevertheless, the need for training requires evidence that the municipality failed to train its employees. *See Griffith v. Franklin Cty.*, 975 F.3d 554, 584 (6th Cir. 2020). Here, Simpkins does not offer evidence that the jail failed to train its employees at or near the time of these incidents. Relatedly, Simpkins also would need to have shown what type of training would have been adequate to give the jury a baseline from which to evaluate the jail's training program. *See Winkler v. Madison Cty.*, 893 F.3d 877, 903 (6th Cir. 2018). But he did not offer any such evidence.

Simpkins's failure-to-train claim also flounders on the third element—that the lack of training caused Simpkins's injury. However, it is not clear that it did. As already mentioned, at the heart of Simpkins's *Monell* claim is an alleged gratuitous physical assault on him by a jailer in a hallway. But the DOJ Report did not document a lack of training and supervision for rogue officers who gratuitously assault inmates; rather, it documented a lack of training and supervision on de-escalation tactics and alternatives to pepper spray, tasers, and restraint chairs. For a *Monell* claim, the plaintiff's constitutional violation had to occur "because of" the municipality's custom of inadequate training. *Burgess*, 735 F.3d at 478. Here, Simpkins has not shown how training on de-escalation tactics prior to use of pepper spray, tasers, or restraint chairs would have prevented a rogue officer from committing a malicious assault on Simpkins or from fastening the restraint chair's strap around his neck so tightly that he struggled to breathe and then taunting him about it. A municipality cannot be liable for a failure to train if training its employees would not have prevented the violation in the first place. *See Harris*, 489 U.S. at 391. Here, the DOJ Report did not document a failure to train officers that they must not assault inmates in hallways or how to avoid choking inmates by fastening straps around their necks. Thus, Simpkins has not established

a causal connection sufficient for a reasonable jury to find for Simpkins on his failure-to-train claim.

In dissenting, I do not mean to excuse any constitutional violations that occurred at the jail. What Simpkins alleges and the incidents that the DOJ Report reported are, if true, simply inexcusable. Still, inexcusable conduct by the jail's officers is not all that is required to hurdle the high bar that the Supreme Court set in *Monell*. Although the district court erred by excluding the DOJ Report, including the DOJ Report would not have been enough for Simpkins's *Monell* claim to survive summary judgment. Therefore, I would hold that the district court's refusal to consider the DOJ Report was harmless error and affirm summary judgment to Boyd County.

For the foregoing reasons, I respectfully dissent from the majority opinion.